[No. S013951. July 29, 1991.]

CALIFORNIA FEDERAL SAVINGS AND LOAN ASSOCIATION,
Plaintiff and Respondent, v.
CITY OF LOS ANGELES, Defendant and Appellant.

4

## COUNSEL

James K. Hahn, City Attorney, Richard A. Dawson, Assistant City Attorney, and Myrtle Dankers, Deputy City Attorney, for Defendant and Appellant.

Louise H. Renne, City Attorney (San Francisco), John J. Doherty and Thomas J. Owens, Deputy City Attorneys, Joan R. Gallo, City Attorney (San Jose), Michael F. Dean, City Attorney (Roseville), Jack L. White, City Attorney (Anaheim), and William C. Marsh, City Attorney (Monterey), as Amici Curiae on behalf of Defendant and Appellant.

Martin S. Schwartz, McKenna, Conner & Cuneo, McKenna & Fitting, Aaron M. Peck, Michael T. Lambert and Theresa A. Kristovich for Plaintiff and Respondent.

Christopher Chenoweth, Philip M. Plant, Ronald A. Zumbrun, Anthony T. Caso and Jonathan M. Coupal as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

ARABIAN, J.—Since the addition of the "home rule" provision to our Constitution in 1896, the organic law of California has granted charter cities

sovereignty over "municipal affairs." Although this court and the Court of Appeal have parsed that cryptic phrase in literally scores of cases in the 95 years since the adoption of what is now article XI, section 5, subdivision (a) of the Constitution, what an early member of this court called those "wild words" have defeated efforts at a defining formulation of the content of "municipal affairs." We granted review in this case to decipher the "municipal affairs" clause as it governs conflicting claims of the Legislature and a charter city to levy taxes on financial corporations.

## I. *Introduction*

The City of Los Angeles (City) imposes an annual license tax on most businesses within its municipal boundaries. It sought to collect the tax from California Federal Savings and Loan Association, petitioner here, for the 1982 through 1984 tax years despite the Legislature's 1979 amendment of Revenue and Taxation Code section 23182, which declared that a state income tax on financial corporations such as petitioner was in lieu of all other taxes and licenses, including charter city business license taxes.

Petitioner paid the business license tax under protest and filed this refund action in the superior court, claiming that the state statute, as amended, nullified the City's power to levy the business license tax upon it. The City defended on the ground that its tax was a local revenue measure to raise funds for local expenditure and that as such it qualified as a "municipal affair" immune from state legislative interference by virtue of article XI, section 5, subdivision (a) of the Constitution (hereafter article XI, section 5(a)).[1] Following a bench trial, the superior court ruled for petitioner, holding that the taxation of financial corporations is a subject of "statewide concern" rather than a "municipal affair" and that the record before it supported findings of the Legislature to that effect.

The Court of Appeal disagreed. Reversing the trial court, it concluded that unlike regulatory matters, where state laws addressing subjects of statewide concern prevail over conflicting charter city enactments, our decisions presented a distinct line of authority that charter city tax measures are inflexibly "municipal affairs" and thus invariably are immune from state legislative supremacy.

---

[1]That section provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

We reverse. Although municipal taxation is a "municipal affair" within the meaning of article XI, section 5(a), in that it is a necessary and appropriate power of municipal government, aspects of local taxation may under some circumstances acquire a "supramunicipal" dimension, transforming an otherwise intramural affair into a matter of statewide concern warranting legislative attention. In short, our cases do not support the distinction drawn by the Court of Appeal; charter city tax measures are subject to the same legal analysis and accumulated body of decisional law under article XI, section 5(a), as charter city regulatory measures. In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a "municipal affair" to the extent of the conflict and must yield. In addition, we hold that under the circumstances of this case the trial court correctly concluded that the aggregate intrastate tax burden on financial corporations —including local taxes such as the City's business license tax—is a subject of statewide concern.

The path to these conclusions requires our review of the recent history of California's differing tax treatment of commercial banks and savings banks such as petitioner as well as the development of the "municipal affairs" doctrine in this state.[2]

## II. *The Regulatory Setting*

### A.

In the idiom of banking law, petitioner is a "HOLA" institution, meaning it holds a charter granted by the Federal Home Loan Bank Board under the federal Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.). Although headquartered in Los Angeles, petitioner maintains 135 branch offices throughout the state as well as a smaller number of full service branches in Nevada, Florida, and Georgia. Together with other commercial and savings banks, petitioner participates in a network that operates several thousand automatic teller machines across North America. Many of petitioner's borrowers and depositors reside outside of both Los Angeles and California. Much of the real property securing loans made by petitioner lies outside of Los Angeles, and some lies outside of the state.

---

[2]Throughout this opinion, we use the generic term "savings bank" rather than one of the variant forms (e.g., "thrift bank," "savings association," or "savings and loan association") to refer to financial institutions such as petitioner, whether chartered under division 2 of the California Financial Code or the federal Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.).

California-chartered counterparts to federal HOLA institutions such as petitioner are known as "Division Two" institutions, a term derived from the regulatory locus of state savings banks in division 2 of the California Financial Code. In statutory origin, state and federally chartered savings banks are distinct from the two major types of commercial banks operating in California: national banks established under the federal National Bank Act (12 U.S.C. § 21 et seq.), and state commercial banks chartered and regulated under division 1 of the California Financial Code.

For over 60 years, both state and federally chartered commercial banks operating in California have been subject to a single state tax levied on their net income and imposed in lieu of all other taxes, whether state, county, or municipal. The Legislature's exclusive power to tax commercial banks is conferred by article XIII, section 27, of our Constitution, a provision first adopted by the voters in 1928 following a series of decisions by the United States Supreme Court requiring in effect a single state tax on national banks in lieu of all other state taxes and one no higher than the highest tax rate levied on nonfinancial corporations.[3]

Although not included within the class of banks subject to the exclusive state tax required by article XIII, section 27 of the Constitution, state and federal savings banks also became indirectly entitled in 1928 to substantially equivalent tax treatment through a so-called "offset" system effected by statute. Under the offset system, both state and federal savings banks could claim a credit against their net state tax liability for taxes paid to municipalities. In effect, the offset system promoted a rough albeit indirect equality between the aggregate California tax burden on commercial banks—whether state or federal—and on their state and federal savings bank counterparts.[4]

---

[3] As we explained in *Western States Bankcard Assn.* v. *City and County of San Francisco* (1977) 19 Cal.3d 208, 215-216 [137 Cal.Rptr. 183, 561 P.2d 273]: "California's in lieu tax scheme . . . was designed . . . primarily to make possible state taxation of national banks. Until 1973, [12 United States Code] section 548 . . . imposed severe restrictions on state taxation of national banking associations. Basically, states were allowed to levy one of several specified taxes, in lieu of all others, and the tax so levied could not exceed that imposed upon state financial corporations. To achieve tax-rate parity between national and state banking institutions, a prerequisite for any tax upon national banks, California adopted the federally designated in lieu tax on net income and made it applicable to all banks located within the state. . . . The end result was that competing state and national institutions received the same benefits and paid taxes at the same rate." (Italics and citations omitted.)

[4] Historically, the statutory scheme has also sought to maintain parity between the taxes paid by commercial banks and financial corporations and those paid by nonfinancial corporations, through the use of a complex formula by which a so-called "add-on" component of the in lieu tax is calculated. The add-on premium is intended to compensate for the fact that nonfinancial corporations are subject to taxes on their personal property while commercial banks are

The offset arrangement continued in effect until 1979. In that year, the Legislature passed Assembly Bill No. 66 (1979-1980 Reg. Sess.; enacted as Stats. 1979, ch. 1150), an omnibus tax measure that included the statute at issue in this case. ██ Section 14 of Assembly Bill No. 66, set out in the margin,[5] amended Revenue and Taxation Code section 23182 (further unspecified statutory references are to this code) to abolish the offset system by declaring that the in lieu feature of the net income tax, formerly applicable only to commercial banks, extended to financial corporations.[6] Effective January 1, 1981, except for taxes on their real property and miscellaneous imposts, section 23182 subjected both commercial and savings banks—whether national banks or federal HOLA savings banks, state division 1 commercial banks or division 2 savings banks—to a single state-imposed net income tax and to no others. At the same time that it placed commercial and savings banks under a unitary income tax regime, the Legislature moved to mitigate the anticipated revenue loss to local governments resulting from the elimination of municipal taxes on financial corporations.[7]

---

exempt from such levies. (Compare Rev. & Tax. Code, § 23151 with Rev. & Tax. Code, § 23186; and see, *post*, fn. 15.)

[5]"Section 23182 of the Revenue and Taxation Code is amended to read:

"23182. The tax imposed under this part upon banks and financial corporations is in lieu of all other taxes and licenses, state, county and municipal, upon the said banks and financial corporations except taxes upon their real property, local utility user taxes, sales and use taxes, state energy resources surcharge, state emergency telephone users surcharge, and motor vehicle and other vehicle registration license fees and any other tax or license fee imposed by the state upon vehicles, motor vehicles or the operation thereof.

"The changes in this section made by the 1979-80 Legislature with respect to sales and use taxes apply to income years beginning on and after January 1, 1980, and the remaining changes apply to income years beginning on and after January 1, 1981."

[6]The California Revenue and Taxation Code does not furnish a statutory definition of "financial corporations." We said in *Crown Finance Corp.* v. *McColgan* (1943) 23 Cal.2d 280, 284 [144 P.2d 331], that the classification was adopted to avoid preferential tax treatment in favor of corporations "in substantial competition with . . . national banks." Under the governing test, the classification includes savings and loans as well as other kinds of "moneyed" corporations "performing some of the functions of a national bank" (*Morris Plan Co.* v. *Johnson* (1940) 37 Cal.App.2d 621, 624 [100 P.2d 493]) or "dealing in money or financing in competition with . . . activities of national banks . . ." (*Marble Mortgage Co.* v. *Franchise Tax Bd.* (1966) 241 Cal.App.2d 26, 39 [50 Cal.Rptr. 345]).

[7]Another provision of Assembly Bill No. 66, section 16.3, added section 26482 to the Revenue and Taxation Code. (Stats. 1979, ch. 1150, p. 4216.) That section established the Financial Aid to Local Agencies (FALA) fund. A portion of the income tax revenues paid to the state by financial corporations subject to the in lieu provision of amended section 23182 was deposited in a state account under section 26483. These funds were in turn allocated to local governments according to a statutory formula. Thus, although section 23182 in effect shifted taxes paid by financial corporations from municipal treasuries to the State Treasury, the subvention granted by the establishment of the FALA fund virtually erased—during its brief existence—any revenue shortfall that otherwise would have been sustained by local tax

The net effect of the 1979 amendment to section 23182 was to place savings banks and other financial corporations on an equal footing with commercial banks as far as their California income tax burden was concerned by, among other changes in tax treatment, eliminating municipal taxes on their activities. As part of Assembly Bill No. 66, the Legislature made the express findings in support of the amendment to section 23182 set out in the margin.[8] In brief, the Legislature explained that the amendment sought to "insur[e] competitive parity between banks and financial corporations" by imposing on both "an equivalent tax burden." Tax equality, it went on to find, would promote the continued existence of both types of institutions as well as ensure that the tax burden on both remained comparable to that on nonfinancial corporations. In addition, the legislative findings in support of the amendment asserted that local taxes on financial corporations were "divergent and competing" and "impair[ed] the uniform statewide regulation of banks and financial corporations." For these reasons, the Legislature declared, it had "preempted" the local taxation of financial corporations "to the same extent as the state has heretofore preempted local taxation of banks." (Stats. 1979, ch. 1150, § 20, p. 4220.)[9]

---

authorities as a result of the change in tax treatment. However, the Legislature did not renew the FALA program in 1982 or thereafter.

[8]"The amendment to Revenue and Taxation Code Section 23182 contained in this act reaffirms the Legislature's longstanding purpose of insuring competitive parity between banks and financial corporations by subjecting both types of institutions to an equivalent tax burden. Equal tax treatment of banks and financial corporations promotes the continued existence of both types of institutions thereby affording a full range of financial services at competitive rates. Moreover, taxation of banks and financial corporations at the rate determined under Revenue and Taxation Code Section 23186 insures that their tax burden will be comparable to the combined state and local tax burdens of nonfinancial corporations subject to Revenue and Taxation Code Section 23151.

"The Legislature further finds that divergent and competing local tax measures imposed on financial corporations impair the uniform statewide regulation of banks and financial corporations. For this reason and those earlier expressed, the Legislature declares that the state, by this amendment, has preempted such local taxation of financial corporations to the same extent as the state has heretofore preempted local taxation of banks." (Stats. 1979, ch. 1150, § 20, p. 4220.)

[9]Subsequent legislation on this subject and the findings in support of it bear mention. In 1984, the Legislature enacted the measure codified as section 23184.5. The statute notes the pendency of litigation "regarding the application of Section 23182 with respect to business license taxes imposed by charter cities on financial corporations" and directs reinstatement of the offset system if charter city taxes are upheld. It directs the Franchise Tax Board to issue proposed deficiency assessments "disallowing those offsets claimed on returns for income years beginning in 1983 and thereafter," pending the outcome of the litigation. In support of the enactment, the Legislature reaffirmed prior findings that the offset system did not permit all local taxes paid to be recouped, was "ineffective to bring parity to banks and financial corporations," and declared that section 23182 was enacted to minimize differences in tax treatment between commercial banks and financial corporations by levying an in lieu tax on

### B.

Los Angeles is a charter city within the meaning of article XI, section 5, of the California Constitution. For more than 40 years the City has assessed the annual business license tax under the provisions of its municipal code on financial corporations (L.A. Mun. Code, § 21.00 et seq.), including savings banks such as petitioner. The tax is a gross receipts tax calculated as a percentage of the total dollar value of the taxpayer's entire annual business activity, payable even in the absence of net income to the taxpayer in a given tax year. Evidence before the trial court disclosed that for the 1985-1986 budget year, City revenues derived from the business license tax amounted to $186 million, or just under 9 percent of the City's $2.1 billion in total revenues. Of this sum, less than 10 percent or approximately $17 million in revenues was derived from business license taxes paid by savings banks and other financial corporations, a figure amounting to roughly 0.8 percent of the City's total 1985-1986 budget.

Following enactment of Assembly Bill No. 66, the City did not attempt to collect the business license tax from financial corporations within its jurisdiction for the 1981 tax year. But beginning with the 1982 tax year, after the Legislature failed to renew the FALA allocation established by Assembly Bill No. 66, the City again assessed the tax against petitioner. As we have noted, petitioner paid the taxes due under protest, brought this suit seeking a refund, and prevailed in the trial court before that judgment was reversed by the Court of Appeal.

### III. *"Municipal Affairs" and the Amendment of 1896*

### A.

The fulcrum of the Court of Appeal's opinion reversing the trial court's judgment was *Ex Parte Braun* (1903) 141 Cal. 204 [74 P. 780], one of the early decisions of this court interpreting the "municipal affairs" clause following its adoption by the voters in the election of 1896. In *Braun*, we considered a City ordinance imposing a license tax on a variety of occupations solely for revenue purposes. Braun, a wholesale liquor dealer subject to the tax, resisted paying it on the ground that the Legislature had forbidden the City to license occupations for revenue purposes by enacting a statute declaring that municipalities could impose license taxes for regulatory purposes only. Braun was prosecuted by the City and convicted of failing to pay the tax; he sought habeas corpus relief before this court.

We upheld the tax against Braun's claim that the Legislature could determine by general laws the tax policies of charter cities, ruling that the

---

the latter and "prohibit[ing], among other things, charter cities from imposing business license taxes on financial corporations." (Stats. 1984, ch. 1359, § 1, pp. 4792-4793.)

recently adopted home rule provision was intended to secure to such cities "the maintenance of . . . charter provisions in municipal matters, and to deprive the legislature of the power . . . to interfere in the government and management of the municipality." (*Ex Parte Braun, supra*, 141 Cal. at p. 209.) We reasoned that "the power of taxation is a power appropriate for a municipality to possess"; that that proposition was "too obvious to merit discussion"; and that the use of licensing statutes as revenue measures was "a well-recognized exercise of the taxing power." (*Ibid.*) Braun's effort to avoid paying a municipal tax on the ground that the Legislature had forbidden a charter city to levy it thus failed.

After almost a century of litigation inspired by the uncertain meaning of "municipal affairs," we see no reason to question the soundness of *Ex Parte Braun* or to depart from its holding. The opinion remains a germinal gloss on the home rule provision of article XI, section 5(a), and one vital meaning of the doctrine it embodies—a recognition of the affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . ." and of the important corollary that "so far as 'municipal affairs' are concerned," charter cities are "supreme and beyond the reach of legislative enactment." (141 Cal. at p. 207.)

We had no occasion in *Ex Parte Braun*, however, to deal with a correlative dimension of the "municipal affairs" doctrine, namely those conditions under which the obverse proposition applies and the Legislature constitutionally may supplant charter city measures with its own enactments. No argument was made in *Braun*, for example, that the state statute purporting to dictate charter city tax policy was driven by a widespread fiscal crisis across the state, or provoked by some other broad controversy of the day making municipal tax policy an overarching issue, or by any other extramunicipal concern sufficient to compel legislative action or make its exercise appropriate.

Rather, as our opinion in *Ex Parte Braun* noted, the effect of the city's revenue measure was entirely local, "confined in operation to the city of Los Angeles, and affect[ing] none but its citizens and taxpayers and those doing business within its limits." (141 Cal. at p. 210.) Nor is there any suggestion that Braun offered a defense to his prosecution based on the claim that the state statute was prompted by anything more than an anchorless legislative desire to continue to assert plenary control over municipal governments, including charter cities.[10] Our opinion rejected the state's attempt as a

---

[10]As our opinion in *Braun* pointed out (141 Cal. at pp. 208-209), the historical impetus for adoption of the municipal home rule provision in 1896 was in part a series of decisions by this court holding that the power to adopt charters (and thus to adopt self-government) given cities

groundless invasion of a core area of municipal concern—the power to tax in support of local government—prohibited by the home rule provision. Seminal as the *Braun* opinion was to the evolution of the "municipal affairs" doctrine in California, it necessarily represents an incomplete analysis, standing for nothing so much as the now unexceptional proposition that levying taxes to support local expenditures qualifies as a "municipal affair" within the meaning of the home rule provision of our Constitution.

In short, *Ex Parte Braun, supra,* 141 Cal. 204, illustrates only one side of the coin of home rule. The clause affirmatively grants charter cities sovereignty over those matters deemed to be "municipal affairs," but it also implicitly recognizes state legislative supremacy over matters not within the ambit of that phrase. Although we held in *Braun* that the power to levy local taxes in support of local expenditures is an essential function of municipal government, secure against legislative usurpation, we did not address directly this countervailing dimension. It is one thing to identify local taxation as an affirmative power of local government, as we did in *Braun,* and therefore a "municipal affair." It is a quite different undertaking to formulate the criteria by which the choice is made between conflicting state and municipal enactments when both stem from concerns rooted in their respective spheres of government.

Subsequent cases rounded out the "municipal affairs" doctrine by taking up the larger theme of the limits on a charter city's sovereignty when aspects of its activities interfere with interests which transcend the municipality. In the main, our later decisions reject a static and compartmentalized description of "municipal affairs" in favor of a more dialectical one. Out of these cases emerges the counterpoint of "statewide concern" as a conceptual limitation on the scope of "municipal affairs" and thus on the supremacy of charter city measures over conflicting legislative enactments.

The Court of Appeal in this case purported to distinguish these later "statewide concern" cases on the ground that they dealt exclusively with charter city regulatory, rather than taxation, measures. That distinction,[11] together with the companion conclusion that our opinion in *Ex Parte Braun*

by former section 8 (repealed June 2, 1970) of article XI of the Constitution could in effect be overridden by the language of then section 6 (now section 5) of article XI of the Constitution. It was to ensure that city charters could no longer "at once be superseded by . . . general legislative enactment" (141 Cal. at p. 209) that the "municipal affairs" clause was proposed to and adopted by the voters. (See *Davies* v. *City of Los Angeles* (1890) 86 Cal. 37 [24 P. 771] and cases cited at p. 41; *Fragley* v. *Phelan* (1899) 126 Cal. 383, 387 [58 P. 923] (Garoutte, J.).)

[11]A review of the cases suggests the origin of the taxation/regulatory distinction in the opinion of Justice Richardson concurring in *Weekes* v. *City of Oakland* (1978) 21 Cal.3d 386, 398-409 [146 Cal.Rptr. 558, 579 P.2d 449]. While Justice Richardson's views on the doctrine

made charter city powers of taxation forever sacrosanct, led the Court of Appeal to fracture the doctrine of "municipal affairs" and the case law supporting it into two halves, "each with uncompromising language and holdings," as the opinion put it. It declined altogether to apply the concept of statewide concern as a limitation on the power of the City to levy its business license tax against petitioner; in a case such as this presenting a taxation rather than a regulatory measure, limits derived from that notion were deemed "irrelevant."

As our exposition of the *Ex Parte Braun* holding suggests, however, the duality perceived in our opinions by the Court of Appeal is illusory; *Ex Parte Braun, supra,* 141 Cal. 204, does not reject the statewide concern analysis as irrelevant to "municipal affairs" cases presenting local taxation issues. It simply predates the development of that branch of the doctrine; more importantly, *Braun* dealt with a statute which, as we have discussed, sprang from an attempt to decree the essentials of municipal tax policy rather than to further an identifiable interest of extramural dimension.

Nor is the post-*Braun* authority invoked by the Court of Appeal supportive. None of the half dozen of our decisions relied on to shore up the conclusion that *Ex Parte Braun* holds immutable the power of charter cities to levy taxes considers the question at issue in this case—whether a charter city tax measure continues to qualify as a "municipal affair" to the extent that it conflicts with a statute addressing a subject of statewide dimension.[12]

---

of "municipal affairs" were highly developed and well articulated in a series of concurring opinions—of which *Weekes* is the most prominent—they have commanded few adherents. (See also *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 146 [185 Cal.Rptr. 232, 649 P.2d 874].)

[12]*Ex Parte Helm* (1904) 143 Cal. 553 [77 P. 453] was a companion to *Ex Parte Braun.* There we extended our holding in *Braun* to include a state statute purporting to restrict the licensing powers of municipalities to regulatory matters. In *West Coast Adver. Co.* v. *San Francisco* (1939) 14 Cal.2d 516 [95 P.2d 138], we in effect revisited *Ex Parte Braun* by construing a 1914 amendment to article XI, section 5, of the Constitution as transforming a municipal charter from an instrument granting powers to one limiting powers implicit within the home rule clause; no conflict with a state statute was presented. And in *Ainsworth* v. *Bryant* (1949) 34 Cal.2d 465 [211 P.2d 564], we held only that the power to "license and regulate intoxicating liquors" conferred on the Legislature by article XX, section 22, of the Constitution did not encompass exclusive control over the taxation of alcohol, and thus did not conflict with a charter city excise tax as applied to retail liquor purchases.

Our decision in *City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93 [308 P.2d 1], held only that a charter city could enact a rubbish collection tax without specific authorization in its charter, a conclusion foreshadowed by *West Coast Advert.*; there was no conflict with a state statute. In *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21 [37 Cal.Rptr. 74, 389 P.2d 538], we rejected a claim that a tax allocation provision of a City redevelopment plan was unconstitutional because adopted by ordinance rather than charter amendment; again, no

■ Moreover, we find no reason in any policy underlying the municipal home rule provision why the subject of charter city taxation should merit treatment different from charter city regulatory measures. It is true, as we pointed out in *Ex Parte Braun, supra,* 141 Cal. 204, that the power to govern—whether local or state—means little without the coordinate power to tax, so integral is finance to government. But that is only a truism. It fails to explain why, among all other municipal powers, the power to tax should be singled out as specially protectible, as uniquely unyielding to transcendent interests. The answer cannot be that the Legislature's power to deprive a charter city of its authority to levy taxes is the power to cripple or destroy it, at least, to borrow Justice Holmes's phrase, "while this Court sits." (*Panhandle Oil Co.* v. *Knox* (1928) 277 U.S. 218, 223 [72 L.Ed. 857, 859, 48 S.Ct. 451, 56 A.L.R. 583].) Our charge under the Constitution to adjudicate such disputes confers ample power to preserve the core meaning of municipal home rule against legislative inroads.

Thus the problem set for us by this case is not the one we faced in *Ex Parte Braun* of identifying the essentials of "municipal affairs." Instead, it is that of adjusting the conflict between the effects of the City's business license tax and the Legislature's asserted interest in the uniform taxation of commercial banks and financial corporations, including savings banks such as petitioner. That, rather than the question whether the City's status as a charter city encompasses the power to levy local taxes in support of its expenditures, is the real issue before us.

## B.

Concurring in the majority opinion in *Ex Parte Braun,* Justice McFarland wrote that the Constitution "uses the loose, indefinable, wild words 'municipal affairs,' and imposes upon the courts the almost impossible duty of

conflict with state statute was presented. Finally, in *A.B.C. Distributing Co.* v. *City and County of San Francisco* (1975) 15 Cal.3d 566 [125 Cal.Rptr. 465, 542 P.2d 625], we again held, as we had in *Ainsworth,* that San Francisco's "payroll expense tax" did not conflict with the state's regulatory jurisdiction over alcoholic beverages conferred by article XX, section 22, of the Constitution when levied against employees of a wholesale liquor dealer.

(See, generally, *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 291-292 [32 Cal.Rptr. 830, 384 P.2d 158].)

At least one Court of Appeal decision supports the contrary proposition. In *Century Plaza Hotel Co.* v. *City of Los Angeles* (1970) 7 Cal.App.3d 616 [87 Cal.Rptr. 166], the court enjoined enforcement of a city excise tax levied on retail sales of alcohol consumed on the premises. After finding a state statute imposing a tax on the sale of alcohol in lieu of all county and municipal sales taxes to be in "irreconcilable conflict" with the charter city tax ordinance, the court identified substantial statewide interests sufficient to justify legislative supersession and the negation of the conflicting charter city tax ordinance. (*Id.* at pp. 624-626.)

Although its evaluation of the strength of the state's interests has been criticized (Sato, *"Municipal Affairs" in California* (1972) 60 Cal.L.Rev. 1055, 1099-1104), the methodology employed by the Court of Appeal in *Century Plaza* is the correct one; see, *post,* page 16.

saying what they mean." (141 Cal. at p. 214.) He predicted—with foresight —that this court "probably will not undertake to give a general definition of the words, so as to bring all future cases within the two categories of what is and what is not a municipal affair. A few cases . . . have arisen, and in each of such cases the court has merely determined . . . whether the thing there involved was or was not within the indeterminate constitutional words." (*Ibid.*)

■ The idea that the content of "municipal affairs" is indefinite in its essentials is one that has taken root in our cases on the subject. We have said that the task of determining whether a given activity is a "municipal affair" or one of statewide concern is an ad hoc inquiry; that "the constitutional concept of municipal affairs is not a fixed or static quantity" (*Pac. Tel. & Tel. Co.* v. *City and County of S. F.* (1959) 51 Cal.2d 766, 771 [336 P.2d 514]); and that the question "must be answered in light of the facts and circumstances surrounding each case" (*In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809]). "No exact definition of the term 'municipal affairs' can be formulated and the courts have made no attempt to do so, but instead have indicated that judicial interpretation is necessary to give it meaning in each controverted case." (*Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 147 [82 P.2d 434, 126 A.L.R. 838].) But our decisions have also strived to confine the element of judicial interpretation by hedging it with a decisional procedure intended to bring a measure of certainty to the process, narrowing the scope within which a sometimes mercurial discretion operates.

In broad outline, a court asked to resolve a putative conflict between a state statute and a charter city measure initially must satisfy itself that the case presents an actual conflict between the two. If it does not, a choice between the conclusions "municipal affair" and "statewide concern" is not required. Our decisions in *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63-64 [81 Cal.Rptr. 465, 460 P.2d 137], upholding a charter city's wage scale on the ground that the Legislature did not intend to subject it to the prevailing wage provisions of the Labor Code, and *Weekes* v. *City of Oakland, supra,* 21 Cal.3d 386, upholding a "license fee" on all persons employed in a charter city on the ground that it was not an income tax prohibited by state law, are examples of cases—important perhaps more for their influential obiter than for their holdings—in which we found no real conflict. And as the summary of the cases relied on by the Court of Appeal in this case, *ante,* at footnote 12, illustrates, many opinions purportedly involving competing state and local enactments do not present a genuine conflict. To the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of

constitutional law, they ought to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other.

In those cases where the preliminary conditions are satisfied, that is, where the matter implicates a "municipal affair" and poses a genuine conflict with state law, the question of statewide concern is the bedrock inquiry through which the conflict between state and local interests is adjusted. If the subject of the statute fails to qualify as one of statewide concern, then the conflicting charter city measure is a "municipal affair" and "beyond the reach of legislative enactment." *Ex Parte Braun, supra,* 141 Cal. 204, itself is the paradigm of a legislative effort to prescribe a core municipal activity— local taxation—without support originating in identifiable statewide concerns. If, however, the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution, then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.

The phrase "statewide concern" is thus nothing more than a conceptual formula employed in aid of the judicial mediation of jurisdictional disputes between charter cities and the Legislature, one that facially discloses a focus on extramunicipal concerns as the starting point for analysis. By requiring, as a condition of state legislative supremacy, a dimension demonstrably transcending identifiable municipal interests, the phrase resists the invasion of areas which are of intramural concern only, preserving core values of charter city government. As applied to state and charter city enactments in actual conflict, "municipal affair" and "statewide concern" represent, Janus-like, ultimate legal conclusions rather than factual descriptions. Their inherent ambiguity masks the difficult but inescapable duty of the court to, in the words of one authoritative commentator, "allocate the governmental powers under consideration in the most sensible and appropriate fashion as between local and state legislative bodies." (Van Alstyne, Background Study Relating to Article XI, Local Government, Cal. Const. Revision Com., Proposed Revision (1966) p. 239.)

In performing that constitutional task, courts should avoid the error of "compartmentalization," that is, of cordoning off an entire area of governmental activity as either a "municipal affair" or one of statewide concern. Beginning with the observation in *Pac. Tel. & Tel. Co.* v. *City and County of S. F., supra,* 51 Cal.2d at page 771, that "the constitutional concept of

municipal affairs is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate," our cases display a growing recognition that "home rule" is a means of adjusting the political relationship between state and local governments in discrete areas of conflict. When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city.

A corollary of that proposition is that every decision sustaining a state statute over a charter city measure does not mean that if the former were repealed, charter cities would remain incompetent to legislate in the area. Nor does a decision favoring a charter city measure preclude superseding state legislation in a later case if the fact-bound justification—the statewide dimension—is subsequently demonstrated. To approach the dichotomy of "municipal affairs/statewide concern" as one signifying reciprocally exclusive and compartmented domains would, as one commentator has observed, "ultimately all but destroy municipal home rule."[13]

■ In cases presenting a true conflict between a charter city measure—whether tax or regulatory—and a state statute, therefore, the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations. We must decide whether those criteria were met in this case; that is, whether the showing before the superior court supports the Legislature's finding of a need for paramount state control over the aggregate income tax burden on financial corporations such as petitioner.

## IV. Resolving the Issue in This Case

### A.

As suggested near the outset of this opinion, *ante*, at page 8, legislative efforts to achieve "tax rate parity," between federal and state commercial banks, between commercial banks and financial corporations (including savings banks), and between banks and financial corporations and nonfinancial corporations, have been a theme of California corporate tax law for over

[13]Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts*, 48 Minn. L.Rev. 643, 663 (1964) (quoting McGoldrick, Law and Practice of Municipal Home Rule 1916-1930 (1933) at p. 317).

60 years. The genesis of those efforts was a series of federal high court decisions in the 1920's, interpreting the National Bank Act, which threatened to nullify entirely state taxation of national banks on federal supremacy grounds.[14]

■ In California, these decisions culminated in the addition to the Constitution of article XIII, section 27, as the means of achieving the federally required tax equality between state and federally chartered commercial banks and nonfinancial corporations—a condition for any state taxation at all of national banks. The statutory scheme implementing the constitutional provision sought to achieve tax parity between these three kinds of corporations, and provided for an exclusive net income tax on commercial banks, in lieu of all municipal income taxes.[15] As a matter of historical fact, then, since 1928 the taxation of commercial banks has been—de jure—exclusively a topic of statewide concern, albeit one imposed externally by requirements of federal-state relations bottomed on the supremacy clause of the federal Constitution.

Contemporaneously with the imposition of the exclusive "bank tax in lieu shield," as it is sometimes called, of section 23182, savings banks were accorded indirect tax parity with commercial banks by means of the statutory offset system of tax credits described above. (*Ante,* at p. 8.) Whether the existence of the offset credit beginning in 1928 supports the cognate conclusion that the taxation of savings banks has likewise had a statewide dimension since that time is a question we need not decide. For the historical

---

[14]E.g., *Merchants National Bank* v. *Richmond* (1921) 256 U.S. 635 [65 L.Ed. 1135, 41 S.Ct. 619]; *First National Bank* v. *Anderson* (1926) 269 U.S. 341 [70 L.Ed. 295, 46 S.Ct. 135]; and *First National Bank of Hartford* v. *Hartford* (1927) 273 U.S. 548 [71 L.Ed. 767, 47 S.Ct. 462, 59 A.L.R. 1]. Congressional amendments to the federal statute (12 U.S.C. § 548), their construction by the federal high court, and California's reaction leading to adoption of article XIII, section 27, of the Constitution are analyzed in a notable series of articles in the California Law Review by a then Boalt Hall faculty member, Roger J. Traynor. (See *National Bank Taxation in California* (1929) 17 Cal.L.Rev. 83, 232, 456.)

[15]Section 23180 et seq. The statutory scheme was described in *Citrus Belt S. & L. Assn.* v. *California Franchise Tax Bd.* (1963) 218 Cal.App.2d 584, 588-589 [32 Cal.Rptr. 579], as one designed "to equalize the tax burdens of banks, financial corporations and nonfinancial corporations. The principal features of the [scheme] are these: Nonfinancial corporations, banks and financial corporations all pay a basic franchise tax . . . . (Rev. & Tax. Code, §§ 23151, 23181, 23183 and 23186.) Nonfinancial corporations, however, such as manufacturing and mercantile corporations, also pay personal property taxes. [Citations.] Banks are exempted from the payment of personal property taxes. (Cal. Const., art. XIII, § [27]; Rev. & Tax. Code, § 23182.) [¶] In order more nearly to equalize the tax burdens of banks and nonfinancial corporations, banks are required to pay an additional amount of taxes . . . at a rate equivalent to the percentage of the total net income of nonfinancial corporations that nonfinancial corporations pay as personal property taxes . . . . (Rev. & Tax. Code, § 23183; . . .)"

thread of "tax rate parity" surfacing in the 1920's intersects with economic and regulatory forces affecting state and federal savings banks loosed in the 1970's. It is the existence of these forces, of even greater contemporary urgency, that underlie and sustain the Legislature's decision to widen the bank tax in lieu shield to encompass financial corporations such as petitioner.

B.

The antecedents behind the severe problems plaguing the nation's savings and loan industry have been extensively documented in a series of congressional reports, studies and recommendations.[16] Financial, regulatory, and economic experts for the most part agree that the present savings crisis originated in the inflationary and interest rate spirals of the 1970's. Since savings banks have for most of this century been the chief source of long-term, mortgage-backed residential lending, rapid increases in short-term interest rates had a devastating effect on their historical "borrow short, lend long" position.

Locked into long-term, low-yield, fixed-rate mortgages, savings banks were forced to compete for funds—mainly savings deposits—in the newly volatile short-term market of the 1970's, and to pay a commensurately high interest rate to attract such funds. This interest rate differential led to the phenomena of "disintermediation"—massive withdrawals by savings

---

[16]In addition to several days' testimony by experts in the fields of economics and banking regulation, the trial court had before it the following congressional reports and studies; we rely on these materials for the summary of the evolving economic and regulatory environment affecting the savings and loan industry presented in the main text: the Depositary Institutions Deregulation and Monetary Control Act of 1980, Public Law No. 96-221, Senate Report No. 96-368 (1979) (documenting substantial savings outflow from thrifts and need to expand investment portfolios to attract additional funds); Report of the Interagency Task Force on Thrift Institutions, House Committee on Banking, Finance and Urban Affairs, 96th Congress, Second Session (1980) (noting vigorous competition between commercial and savings banks and need to restructure the latter); the Garn-St. Germain Depositary Institutions Act of 1982, Public Law No. 97-320, Senate Report No. 97-536 (1982) (detailing increasing competition between commercial and savings banks for funds and need for restructuring of saving and loan industry); Senate Conference Report No. 97-641 (1982) (accompanying Pub.L. No. 97-320) (same); Confusion in the Legal Framework of the American Financial System and Services Industry, Thirty-Seventh Report by the Committee on Government Operations, House of Representatives Report No. 98-692, 98th Congress, Second Session (1984) (description of functional compartmentalization of the financial services industry and its breakdown); "Economic Report of the President," Annual Report of the Council of Economic Advisers (1986) (interest rate mismatch leading to negative net worth of savings and loan industry); and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Public Law No. 101-73, House of Representatives Report No. 101-54(I) (1989) (tracing history of thrift industry, inflationary pressures of 1970's, regulatory changes of the 1978-1988 era, and current difficulties).

depositors who sought higher interest rates in new consumer investment instruments such as money market funds, for example—and a "negative" interest rate mismatch—the difference between the high cost of funds borrowed by savings banks from depositors and loaned at low rates of interest.

These problems were considered to be compounded by a Depression-era regulatory system that one congressional committee report described as "an incredibly complex inter-locking arrangement of federal and state statutes, regulations, and agencies." (H.R.Rep. No. 98-692, 98th Cong., 2d Sess., p. 7 (1984).) In brief, the regulatory arrangement confined each species of financial services provider to one functional (and in some cases, geographical) theater of specialization; commercial banks, for example, took demand, passbook, and time deposits and made loans to businesses; savings banks took passbook and time deposits and provided housing-related credit; insurance companies collected premiums and paid annuities, and casualty and property claims; and investment banks and brokers underwrote debt and equity issues.

As a result of an ongoing policy debate conducted through much of the latter half of the decade,[17] the decision was taken by regulatory authorities to relieve the pressures on savings banks by pursuing a strategy of "deregulation" designed to restructure the industry, and dismantling legal barriers to enlarged competition between savings banks and other financial services providers, including commercial banks. In a series of recommendations implemented in the late 1970's and early 1980's, the investment powers and the ability of savings banks to compete for deposits were substantially expanded.[18] Federal ceilings on interest paid to depositors were phased out and savings banks were permitted to invest in consumer and educational

---

[17]See generally the pioneering "FINE" (Financial Institutions and the Nation's Economy) study and hearings. (Hearings Before the Subcom. on Financial Institutions, etc., House Com. on Banking, Currency and Housing, 94th Cong., 1st & 2d Sess. (1975) (4 vols.).)

[18]Major federal legislation began in 1978 with passage of the Financial Institutions Regulatory and Interest Rate Control Act (FIRICA), Public Law No. 95-630, tightening controls on insider trading and interlocking directorates, enhancing regulatory enforcement powers, and permitting federally chartered savings banks to offer transaction accounts and alternative mortgage instruments where state chartered savings banks were permitted to do so. This was followed in 1980 by passage of the Depository Institutions Deregulation and Monetary Control Act (DIDMC), Public Law No. 96-221, phasing out interest caps altogether, raising insurance coverage on savings deposits, and authorizing savings banks to offer demand-like ("NOW") accounts to facilitate competition with commercial banks. In 1982, Congress passed the Garn-St. Germain Depositary Institutions Act, Public Law No. 97-320, broadly granting greater flexibility to savings banks in pursing investment policies. Recently, Congress passed so-called "bail-out" legislation, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRRE), Public Law No. 101-73, significantly modifying the existing federal regulatory structure dating from the 1930's, and authorizing funding to resolve the problem of failed savings banks and dispose of their assets.

loans, commercial paper, commercial real estate, corporate debt securities, and local government obligations, diversifying their investment portfolios. In addition, federally insured savings banks were authorized to offer credit card, overdraft, and trust and fiduciary services, increasing their competitiveness in the financial markets.

Among the array of measures proposed, a federal interagency task force appointed by the President to study the problems facing the savings and loan industry and to submit recommendations to Congress urged state legislatures in 1980 to consider lifting taxes on savings banks "based directly or indirectly on deposits," noting that such taxes "are applicable even when the institution has a loss for the year" and can "compound serious earnings problems."[19]

We need not further tally these transforming legislative changes to the savings and loan regulatory environment. It is enough to note that partially as a result of them, savings banks increasingly have come to resemble commercial banks in both form and function, competing in the same sector of the consumer market for deposits and offering much the same financial "products." In light of that clear trend, the considered regulatory impetus driving it, and underlying structural anxieties, the Legislature could speak meaningfully in 1979 of a desire to ensure "competitive parity" between commercial banks and savings banks; even more could it find a need to promote a comparable income tax burden between commercial and savings banks, given historical efforts in California to maintain tax parity between the two types of institutions.

Finally, the increasingly vulnerable financial condition of the savings and loan industry throughout the decade of the 1970's and beyond supports the Legislature's decision to tighten control over the aggregate intrastate tax burden on savings banks by including them within the bank tax in lieu shield. Given an emerging parity of function between savings banks and commercial banks in the market place, the case was strengthened for a more exacting parity in the income tax treatment of the two types of institutions. By the same token, expert testimony before the trial court confirmed that in the face of increasingly worrisome economic conditions affecting the savings and loan industry, the aggregate tax burden on savings banks has assumed a new and more worrisome dimension.[20]

---

[19]The Report of the Interagency Task Force on Thrift Institutions, House Committee on Banking, Finance and Urban Affairs, 96th Congress, Second Session, Committee Print No. 96-14, pages 48-49 (1980). See also *id.*, at page 257 and following.

[20]Evidence before the trial court showed that petitioner suffered a marked deterioration in net taxable income for the years 1981 to 1983. Petitioner's net taxable income for 1981 was

 Centralized command over the intrastate tax burden on savings banks thus provides an additional and increasingly important regulatory lever, one of several ways by which government can exert heightened control over conditions affecting the failing financial health of a critical segment of the state's economy. Aggregate taxes—including those imposed under the Los Angeles and like municipal tax schemes—have thus acquired a regulatory dimension they might not possess under different economic and competitive conditions affecting the savings and loan industry. And because the comprehensive regulation of savings banks takes place almost entirely at state and federal levels, these regulatory aspects of taxation necessarily transcend local interests; they become, in other words, a subject of statewide concern.

To counter this line of reasoning, the City argues at length that the offset system worked well for over 60 years and that persuasive justification is lacking for the statutory amendment that led to its discard. The evidence before the trial court, however, belies this view and supports the amendment as a rational response to perceived difficulties with the offset system, especially under adverse economic conditions. Testimony before the trial court and legislative findings in support of the amendment to section 23182 both noted inefficiencies in the offset system, especially under difficult economic circumstances. For example, as the federal task force report (see, *ante*, fn. 19) pointed out, tax levies calculated on the basis of gross receipts, such as the City's business license tax, apply even when the taxpayer has no net income for the tax year; they thus threaten to reduce the net worth of already vulnerable savings banks. In addition, the offset formula applied only to the so-called "add-on" component of the state franchise tax; where local taxes exceeded that sum, the credit was unavailable. Finally, the offset credit was only available if the taxpayer had taxable income.

In any event, the City's argument proves too much. The question is not whether the amendment of section 23182 was prudent public policy or whether the municipal tax burden on savings banks has sufficient impact on the industry's financial health to make the change to a net income tax system an advisable or effective measure. The issue is whether the income tax burden on financial corporations, especially savings banks—including the

---

minus $4,480,000; for 1982, minus $55,130,000; and for 1983, minus $8,960,000. Evidently, this financial hemorrhage is continuing. (See *Calfed Is Expecting Loss of $140 Million*, N.Y. Times (Jan. 4, 1991) p. C3, col. 1 [losses reported for the fourth quarter, 1990].)

This negative performance coincided with savings and loan industry trends within California. Data submitted to the trial court compiled by the state's Franchise Tax Board showed industry-wide net taxable income dropping precipitously between 1978 ($885 million) and 1982 ($38 million).

component imposed by municipalities—is of sufficient extramural dimension to support legislative measures reasonably related to its resolution. We conclude that it is, ending the inquiry. In so holding, we resort to a principle of deference analogous to that invoked in *Baggett v. Gates, supra,* 32 Cal.3d at page 140. There we said that "[t]here must always be doubt whether a matter which is of concern to both municipalities and the state is of sufficient statewide concern to justify a new legislative intrusion into an area traditionally regarded as 'strictly a municipal affair.' Such doubt, however, 'must be resolved in favor of the legislative authority of the state.' [Citations.]"

A similar principle applies here. In this area of complex financial and economic regulation, we defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution. ██ ██ It is enough for the purpose of deciding the issue before us that the Legislature's decision to modify the tax system by eliminating local taxes on savings banks finds substantial support in the regulatory and historical context summarized above, including specific recommendations of financial and regulatory experts, and is narrowly tailored to resolve the problem at hand. (*Cf. D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10].)[21]

Support for the conclusion that the local taxation of savings banks is at present a subject of statewide concern is strengthened by the limited extent of the incursion made by section 23182. Among the universe of municipal taxpayers subject to the City's business license tax, only a small number of corporations are affected by the Legislature's amendment of section 23182 and our decision upholding it. As noted, these taxpayers collectively contribute a comparatively small sum to the City's annual budget revenues; the loss

[21]The City complains that the trial court erred in reviewing the Legislature's findings in support of the amendment to section 23182 under a "substantial evidence" standard; instead, it argues, the trial court should have applied its "independent judgment." Although the trial court did state in its decision that "substantial evidence" supported the Legislature's findings, it is clear from the context that the phrase was not used in its technical sense, there being in this case no factual "record" submitted to the trial court to which such a limited scope of review might apply. The trial court heard extensive testimony and took other evidence before concluding that the amendment of section 23182 was supported by an underlying statewide concern. Its evaluation of the evidence was properly aided by the principle of deference to the Legislature's findings articulated in *Baggett v. Gates, supra,* 32 Cal.3d 128. Our statement in *Bishop v. City of San Jose, supra,* 1 Cal.3d at page 63, that "the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern," meant that legislative declarations that a subject is one of statewide concern do not ipse dixit make it so; we exercise our "independent judgment" as to that issue, giving "great weight" to legislative statements of purpose where they exist. (*Id.,* at p. 63, fn. 6.)

of that revenue as a result of the statutory amendment leaves the City's taxing authority fundamentally intact. Although we decline for pragmatic and intellectual reasons to adopt the view urged by Justice Richardson in his concurring opinion in *Weekes* v. *City of Oakland, supra,* 21 Cal.3d 386, requiring a comparative "weighing" of the competing interests of the state and charter cities in a given area, we are mindful of his caveat that "the sweep of the state's protective measures may be no broader than its interest." (*Id.,* at p. 407.) Here, the limited interference with municipal taxation wrought by section 23182 is substantially coextensive with the state's underlying regulatory interest.

## V. *Conclusion*

Justice Richardson acknowledged this court's ineluctable duty under the "municipal affairs" clause to allocate political supremacy between the Legislature and charter cities "without the benefit of guidance from history, constitutional tradition, or sharply delineated principle."[22] The approach to that demanding task historically taken in our cases has been one of ad hoc intuition informed by pragmatic common sense rather than a rigid fidelity to some theoretical model. In an area of constitutional law so deeply marked from the beginning by conceptual uncertainty and inherent factual ambiguity, we should not expect doctrinal tidiness: "constitutions," as Justice Holmes said, "are intended to preserve practical and substantial rights, not to maintain theories." (*Davis* v. *Mills* (1904) 194 U.S. 451, 457 [48 L.Ed. 1067, 1072, 24 S.Ct. 692].)

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Broussard, J., Panelli, J., Kennard, J., and Baxter, J., concurred. Mosk, J., concurred in judgment.

Appellant's petition for a rehearing was denied September 19, 1991. George, J., did not participate therein.

---

[22] *Weekes* v. *City of Oakland, supra,* 21 Cal.3d at page 404.