*1513 BENKE, J.,
Dissenting.—The majority has determined that Labor Code section 1782 merely creates a fiscal “incentive,” which they find encourages, but does not coerce, charter cities and counties to forgo their rights under the home rule provisions of our state Constitution (Cal. Const., art. XI, § 5) and comply with the otherwise inapplicable provisions of the prevailing wage law, Labor Code section 1700 et seq. (See maj. opn., ante, at pp. 1506-1507.) I have two problems with this conclusion. First, there is no authority which holds that the Legislature may attempt to obtain such a waiver of constitutional rights from municipalities by way of incentives as opposed to outright fiscal coercion. Indeed what authority exists with respect to fiscal incentives strongly suggests that where municipal activity is protected by the home rule provisions of the Constitution, the state may not use its fiscal power as a means of inducing a waiver of that protection. (See Sonoma County Org. of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296, 316-317 [152 Cal.Rptr. 903, 591 P.2d 1] (Sonoma County).)
Second, in the most recent federal case that has considered whether the federal government has used its fiscal power to coerce states rather than provide them with a meaningful opportunity to choose the federal government’s preferred course of action (National Federation of Independent Business v. Sebelius (2012) 567 U.S. _ [183 L.Ed.2d 450, 132 S.Ct. 2566, 2579] (NFIB)), a plurality made it clear that intergovernmental coercion arises when a subordinate organ of government is not able to make a knowing and voluntary choice with respect to the benefits being offered by the more dominant organ. Labor Code section 1782 gives municipalities no realistic means of knowing the future impact of their choice to exercise their rights under the home rule provisions of our Constitution. Given the inherent uncertainties surrounding completion of large-scale infrastructure projects and, in particular, the tremendous fiscal risks involved, Labor Code section 1782 cannot be described as anything other than coercive.
In a host of areas — such as climate change regulation, immigrant law enforcement policy, housing, and the provision of local minimum wages — the municipal independence and innovation protected by article XI, section 5 of the state Constitution provide municipalities with important, valuable, and varied opportunities to protect the safety and promote the welfare of their residents. By giving the Legislature an indirect means of achieving what it may not do directly in one relatively narrow area — prevailing wages on construction projects — the majority opinion substantially weakens that independence and innovation in an innumerable number of other fields where a future Legislature may be hostile to local experimentation and interests.
*1514 A. Incentives
The Supreme Court’s holding in State Building & Construction Trades Council of California v. City of Vista (2012) 54 Cal.4th 547, 566 [143 Cal.Rptr.3d 529, 279 P.3d 1022] (Vista) made it abundantly clear that the state has no valid interest in what employees working on municipal projects financed solely by way of municipal funds are paid: “[N]o statewide concern has been presented justifying the state’s regulation of the wages that charter cities require their contractors to pay to workers hired to construct locally funded public works.” (Ibid.) In the absence of such a statewide concern, the home rule provisions of the Constitution prevent the Legislature from directly interfering with a charter city’s decision to leave to the marketplace the compensation to be paid on local construction projects. (Vista, at p. 556; see also California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 17 [283 Cal.Rptr. 569, 812 P.2d 916] (California Fed. Savings).)
In somewhat analogous circumstances, the court in Sonoma County held that what the Legislature may not do directly, it may not do indirectly by way of fiscal inducement. In 1978, following the voters’ enactment of Proposition 13, municipalities and school districts were facing a fiscal crisis because the real property taxes that had been financing their operations had been drastically reduced by the voters. The Legislature, which controlled a state budget with a substantial surplus, promptly enacted a number of remedial measures. One measure required that, as a condition of receiving much needed financial assistance from the state, municipalities refrain from giving their employees any cost-of-living increase that exceeded increases the Legislature had provided state employees. Employees of Sonoma County challenged this condition on the grounds it impermissibly interfered with labor agreements municipalities had made with employee unions. Our Supreme Court agreed and stated: “It is too well established to require extensive citation of authority that, while the state may impose conditions upon the granting of a privilege, including restrictions upon the expenditure of funds distributed by it to other governmental bodies [citations], ‘constitutional power cannot be used by way of condition to attain an unconstitutional result . . . .’ ” (Sonoma County, supra, 23 Cal.3d at p. 319.) Neither I, nor the majority, have been able to locate any authority that would make any exception to this principle in the case of the home rule doctrine embodied in article XI, section 5 of the Constitution.
In this regard, I think it is of particular significance that in unambiguously upholding the right of municipalities to control wages paid on local projects, in Vista the Supreme Court expressly found there is no statewide concern on *1515 that subject. In light of that holding, whether a financial condition is an incentive or coercion is of no moment. The state, we have been told, has no interest in the subject of wages paid by municipalities on local projects. Thus, any financial discrimination against municipalities who exercise their rights— whether the discrimination is only an incentive or amounts to coercion — is inconsistent with the home rule doctrine and cannot be tolerated on the grounds it advances any legitimate interest of the state. It advances no legitimate state concern.
B. Coercion
Although our home rule jurisprudence does not appear to turn on the difference between state incentives and state coercion, in considering the distinct relationship between the federal and state governments, and when and under what circumstances the federal government may attempt to influence the decisions of states over matters within their delegated or implied powers, the United States Supreme Court has determined that although the federal government may use fiscal incentives to influence state behavior, in a given context federal inducements may amount to improper coercion. (See NFIB, supra, 567 U.S. _ [183 L.Ed.2d 450, 132 S.Ct. 2566].)
In NFIB, the plaintiffs challenged a number of provisions of the Patient Protection and Affordable Care Act (ACA; Pub.L. No. 111-148 (Mar. 23, 2010) 124 Stat. 119), including a provision that made, as a condition of continuing any federal subsidy to state Medicaid programs, each states’ agreement to substantially expand the program beyond its general provision for payment of the medical expenses of individuals and families who have household incomes at or below established poverty levels. The Supreme Court found this provision was an improper intrusion on the states’ sovereignty because as a practical fiscal matter it left states with no choice other than to agree to the federally desired Medicaid expansion. In finding that this was coercive the court stated: “[O]ur cases have recognized limits on Congress’s power under the Spending Clause to secure state compliance with federal objectives. ‘We have repeatedly characterized . . . Spending Clause legislation as “much in the nature of a contract.” [Citation.] The legitimacy of Congress’s exercise of the spending power ‘thus rests on whether the State voluntarily and knowingly accepts the terms of the “contract.” ’ ” (NFIB, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2602], second italics added.) Because of the catastrophic loss states would incur in the event all of their federal Medicaid funding was discontinued — in many cases up to 10 percent of their total budgets — the court found the condition could not be characterized as voluntary. (Id. at p. _ [132 S.Ct. at pp. 2604-2605].)
*1516 Admittedly, the coercion Labor Code section 1782 effects is less dramatic than the Medicaid condition considered in NFIB. Nonetheless, Labor Code section 1782 is coercive because as a practical matter it plainly robs municipalities of any real choice other than to apply the prevailing wage law to purely municipal projects. The coercion arises because municipalities that have ordinances or charter provisions that permit bids by contractors who do not meet the requirements of the prevailing wage law have no realistic means of determining how much in state aid will be lost by their choice or how long needed infrastructure will be delayed if they later choose, by the act of the governing body, or as may be needed, a vote of the people, to comply with the Legislature’s desires.
The two-year ban on state aid when municipalities have awarded a contract that does not meet the requirements of the prevailing wage law is particularly coercive. (See Lab. Code, § 1782, subd. (b).) Under Labor Code section 1782, subdivision (b), when a municipality makes such an award, it is gambling that in the next two years it will not have urgent need for state assistance on some other larger and more important project for which it is willing or has already agreed to comply with the prevailing wage law. Given the reality that unknown infrastructure needs may arise or that planned projects that are compliant because they are federally financed may experience serious cost overruns and urgently need state assistance, no municipality governed by prudent executives and legislative bodies would take such a gamble. It takes no imagination to recognize that, by the statute’s own terms, a noncompliant $50,000 bike path contract in one year could shortly thereafter imperil a city’s ability to finance a multimillion-dollar wetland restoration project or a wireless network improvement.
In sum, the substantial risks that Labor Code section 1782 imposes on municipalities deprive them of any ability to make a knowing and voluntary choice to exercise their rights under article XI, section 5 of our Constitution. Thus, it cannot be seen as anything other than coercive.
C. Home Rule
As I indicated at the outset, the majority, by permitting the Legislature to do indirectly what our Supreme Court has said it may not do directly, creates a precedent that will inhibit municipal innovation in any number of other fields. Whenever a particular community attempts to develop a response to a particular problem, whether it is homelessness, drug treatment, water conservation, or immigrant law enforcement, the proponents of the local solution will have far less freedom in doing so, because they will know that in the *1517 end, if their solution is not popular in Sacramento, they can be made to pay a price. In diminishing the vigor with which the home rule doctrine protects local prerogatives, the majority opinion is not only inconsistent with our Supreme Court’s home rule jurisprudence, it is unwise.