Filed 3/29/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF EL CENTRO et al., | D066755 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-0003824-CU-WM-CTL) |
| DAVID LANIER, as Secretary, etc., et al., | |
| Defendants and Respondents, | |
| STATE BUILDING AND CONSTRUCTION TRADES COUNCIL OF CALIFORNIA, AFL-CIO; | |
| Real Party in Interest. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge. Affirmed.

Lounsbery Ferguson Altona & Peak, James P. Lough and Alena Shamos; Richards, Watson & Gershon, T. Peter Pierce and Youstina N. Aziz, for Plaintiffs and Appellants.

Altshuler Berzon, Scott A. Kronland and Zoe Palitz for Real Party in Interest State Building and Construction Trades Council of California, AFL-CIO.

1

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Mark R. Beckington, Kim L. Nguyen and Paul Stein, Deputy Attorneys General, for Defendant and Respondents David Lanier, Christine Baker, Julie A. Su and the State of California.

Renne Sloan Holtzman Skai, Jonathan V. Holtzman, Randy Riddle and Steve Cikes for League of California Cities as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jennifer B. Henning for California State Associations of Counties, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Robert Fried and W. Bryce Chastain, for Associated Builders & Contractors of California, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Olson, Hagel & Fishburn, Lance H. Olson, Deborah B. Caplan and Richard C. Miadich, for California State Legislature as Amicus Curiae on behalf of Defendants and Respondents.

In 2013, the Legislature adopted Labor Code section 1782, which prohibits a charter city from receiving or using state funding or financial assistance for a public construction project if the city has a charter provision or ordinance that authorizes a contractor to not comply with the state prevailing wage laws.  (Lab. Code, § 1782, subd. (a), added by Stats. 2013, ch. 794 (Sen. Bill 7), § 2.  (Undesignated statutory references are to the Labor Code.)  In this case, we affirm a judgment upholding the

constitutionality of section 1782 against a "home rule" challenge brought by a number of charter cities.

FACTUAL AND PROCEDURAL BACKGROUND

Five charter cities, the cities of El Centro, Fresno, Vista, Carlsbad and El Cajon (the Cities), filed a petition for an alternative or peremptory writ of mandate and complaint for declaratory and injunctive relief against defendants the State of California, David Lanier in his official capacity as the Secretary of the State of California Labor & Workforce Development Agency, Christine Baker in her official capacity as the State of California Director of Industrial Relations and Julie A. Su in her official capacity as the State of California Labor Commissioner. (The City of Oceanside was also a plaintiff, but is not a party to this appeal.) The trial court subsequently allowed the State Building & Construction Trades Council of California (Trades Council) to intervene in the action. (Defendants and Trades Council are collectively referred to as respondents.) We granted the applications of League of California Cities (League), California State Association of Counties (Counties) and Associated Builders & Contractors of California to file amicus curiae briefs on behalf of the Cities. We also granted the application of the California State Legislature, to file an amicus curiae brief on behalf of respondents.

Among other things, the Cities sought a writ of mandate to prevent the enforcement of section 1782. The trial court denied relief and entered a judgment in favor of defendants. The Cities timely appealed and filed a petition for a writ of supersedeas to prevent section 1782 from going into effect. We denied the petition. On

3

appeal, the Cities limit their challenge to the extent the trial court denied relief under Article XI, section 5(a) and Article XIII, section 24(b) of the California Constitution.

DISCUSSION

I. *Background*

Since 1931, California has had some form of a prevailing wage law. (*State Bldg. and Const. Trades Council of Cal., AFL-CIO v. City of Vista* (2012) 54 Cal.4th 547, 554 (*Vista*).) The current prevailing wage law requires that contractors on public works projects pay their employees the general prevailing rate of per diem wages. (§§ 1770, 1773.) Contractors must also hire apprentices enrolled in state-approved apprenticeship programs to perform at least a certain percentage of the work and make monetary contributions for apprenticeship training. (§ 1777.5, subds. (c), (g) & (m)(1).) The purpose of the prevailing wage law "is to benefit and protect employees on public works projects," including "to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.)

The California Constitution, however, provides that the ordinances of charter cities supersede state law with respect to "municipal affairs." (Cal. Const., art. XI, § 5.) "[T]his constitutional 'home rule' doctrine reserves to charter cities the right to adopt and enforce ordinances that conflict with general state laws, provided the subject of the

4

regulation is a 'municipal affair' rather than one of 'statewide concern.' " (*Traders Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 45.)

The majority in *Vista* concluded that wage levels of contract workers constructing locally funded public works are a municipal affair. (*Vista*, *supra*, 54 Cal.4th at p. 558.) At issue in *Vista* was state law that required a charter city to comply with California's prevailing wage laws and a charter city ordinance prohibiting compliance with that law. (*Id.* at pp. 560-561.) An actual conflict existed because state law required what the charter city law prohibited. (*Id.* at pp. 559-560.) Based upon principles of the "home rule" doctrine, the *Vista* court held that the wage levels of contract workers constructing locally funded public works are a municipal affair and exempt from state regulation as these wage levels are not a statewide concern subject to state legislative control. (*Id.* at p. 556.) Nonetheless, the *Vista* court noted "that the state could use *its own* resources to support wages and vocational training in the state's construction industry." (*Id.* at p. 562.)

In 2013, in response to *Vista*, the Legislature adopted section 1782 "to provide a financial incentive for charter cities to require contractors on their municipal construction projects to comply with the state's prevailing wage law by making these charter cities eligible to receive and use state funding or financial assistance for their construction projects." (Stats. 2013, ch. 794, § 1, subd. (j).) The Legislature noted that the bill does not address what is or is not a municipal affair and instead addresses how state funds can be used by charter cities. (Senate Com. on Labor and Industrial Relations, Bill Analysis of Sen. Bill No. 7 (2013-2014 Reg. Sess.) as introduced Feb. 19, 2013, p. 6. (Bill

5

Analysis), available online at < http://www.leginfo.ca.gov/pub/13-14/bill/sen/sb_0001-0050/sb_7_cfa_20130312_095142_sen_comm.html > [as of Mar. 29, 2016].)

Generally, section 1782 provides that a charter city is ineligible to receive "state funding or financial assistance" on a construction project if either: (a) the city has a charter provision or ordinance that authorizes a contractor not to pay prevailing wages on a public works contract; or (b) the city has awarded, within the past two years, a public-works contract without requiring the contractor to pay prevailing wages. (§ 1782, subds. (a), (b).) Section 1782 does not apply to funds or contracts awarded prior to January 1, 2015 (§ 1782, subd. (f)), nor to contracts for construction projects of $25,000 or less, or contracts for alteration, demolition, repair, or maintenance projects of $15,000 or less (§ 1782, subd. (d)(1)).

The Legislature made extensive findings when it adopted section 1782. It found that having an available workforce of skilled construction workers to efficiently complete both public and private infrastructure projects and maintaining such a workforce through the continual training of new workers to replace the aging workforce, presents a matter of statewide concern. (Stats. 2013, ch. 794, § 1, subd. (a).) The Legislature found that cities that require compliance with the prevailing wage law on all their public works projects: (1) create a substantial benefit that goes beyond the limits of the city as many of the workers employed on a municipal project do not live in the city where the project is located and many apprentices receiving training on municipal projects will pursue careers outside the city, and (2) further the state's goal to create and maintain good jobs and training opportunities in the construction industry to preserve the middle class. (*Id.*,

6

subds. (g) & (i) at p. 5700.) The Legislature noted that the state has limited financial resources to support local construction projects and providing financial assistance to only those charter cities that require compliance with the prevailing wage law on all their municipal construction projects furthers state policy. (*Id.*, subd. (h).) "To the extent that requiring compliance with the state's prevailing wage law may raise the cost of municipal projects for these cities, these cities also would be more in need of state financial support for their other construction projects. (*Ibid.*) The Legislature stated that it intended "to provide a financial incentive" to charter cities that comply with the prevailing wage law on their municipal construction projects by making these charter cities eligible to receive and use state funding or financial assistance for their construction projects." (*Id.*, subd. (j).) The Legislature found that state funding or financial assistance for charter city construction projects "makes up only a small portion of charter city budgets, and charter cities have the power to raise other revenues if they do not wish to require the payment of prevailing wages on all their municipal construction projects." (*Ibid.*)

## II. *The Cities' Claims*

A. Standard of Review

In reviewing the Cities' claims, " 'all intendments favor the exercise of the Legislature's plenary authority' " and any doubt as to the Legislature's power to act should be resolved in favor of the Legislature's action. (*Calif. Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 253.) The Legislature may exercise " 'any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution.' " (*Id.* at p. 254.) Thus, we look to the Constitution to determine whether

the Legislature is prohibited to act, not whether it is authorized to do an act. (*Ibid.*) We accord " 'great weight' " to the Legislature's evaluation of what constitutes a matter of statewide concern. (*Baggett v. Gates* (1982) 32 Cal.3d 128, 136.) We are also required to "defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution." (*Cal. Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 24 (*Cal. Fed. Savings*).)

Where the Legislature has enacted a statute with constitutional prescriptions clearly in mind, the presumption of constitutionality accorded to legislative acts is particularly appropriate as "the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision." (*Pac. Legal Found. v. Brown* (1981) 29 Cal.3d 168, 180.) "Although the ultimate constitutional interpretation must rest, of course, with the judiciary [citation], a focused legislative judgment on the question enjoys significant weight and deference by the courts." (*Ibid.*)

In reviewing the trial court's ruling on a writ of mandate, we generally examine whether the trial court's findings are supported by substantial evidence. (*Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1559.) To the extent the case presents a question of statutory construction, we review the matter de novo. (*Ibid.*)

B. Analysis

The Cities contend section 1782 violates two provisions of the state Constitution: Article XI, section 5(a), which provides "home rule" authority to charter cities, and Article XIII, section 24(b), which prevents the Legislature from restricting the use of local tax revenues. We address each argument in turn.

1.  Article XI, section 5(a)

Charter cities "may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." (Cal. Const. Art. XI, § 5(a).) "City charters adopted pursuant to this Constitution shall . . . with respect to municipal affairs . . . supersede all laws inconsistent therewith." (*Ibid.*)

A three-prong analysis applies to resolve whether a matter falls within the "home rule" authority of a chartered city. We first determine whether the city ordinance at issue regulates an activity that can be characterized as a municipal affair. (*Vista*, *supra*, 54 Cal.4th at p. 556.) We then determine whether the case presents an actual conflict between local and state law. (*Ibid.*) Finally, we must decide whether the state law addresses a matter of statewide concern and determine whether the law is reasonably related to the resolution of that concern and narrowly tailored to avoid unnecessary interference in local governance. (*Ibid.*)

If no conflict exists, the analysis is complete and we do not reach the third prong. (*Cal. Fed. Savings*, *supra*, 54 Cal.3d at p. 16.) As our high court noted, "many opinions purportedly involving competing state and local enactments do not present a genuine conflict. To the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of constitutional law, they ought to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other." (*Id.* at pp. 16-17.)

9

The wages of contract workers under a locally funded public works contract constitute a municipal affair. (*Vista*, *supra*, 54 Cal.4th at p. 558.) Accordingly, we must proceed to the next step in the analysis to determine whether an actual conflict exists between state law and charter city law. The Cities contend a conflict exists between section 1782 and the Cities' power over their municipal affairs. While the Cities acknowledge the state may impose conditions upon its funding of local construction projects, they assert section 1782 usurps the constitutional authority of charter cities and penalizes charter cities for exercising their constitutionally protected right over municipal affairs. The trial court found no conflict existed between section 1782 and charter city law, noting it is generally constitutional for a state to pursue its policy objectives through financial incentives.

The question whether an actual conflict exists between state law and charter city law presents a matter of statutory construction. (*Vista*, *supra*, 54 Cal.4th at p. 559.) Charter city law is contradictory to state law when it is inimical thereto. (*City of Riverside v. Inland Empire Patients Health and Wellness Center, Inc.* (2013) 56 Cal.4th 729, 743.) "[N]o inimical conflict will be found where it is reasonably possible to comply with both the state and local laws." (*Ibid.*)

Here, the Cities have regulations or ordinances that prohibit or do not require the payment of prevailing wages for the construction of their public works projects. Section 1782 does not conflict with these charter city laws as it does not mandate or require that charter cities do anything, such as paying prevailing wages for its public works projects. Rather, section 1782 provides the Cities with a choice, to meet the requirements set forth

10

in section 1782 to obtain state funding or financial assistance on its public works projects, or forgo eligibility for those funds. For this reason, Counties' attempt to analogize section 1782 with government funding for mandated services is inapt.

The League asserts an actual conflict exists because section 1782 seeks to enter into a field governed exclusively by a charter city's plenary, "home rule" authority. In other words, the League asserts that, because the wages of contract workers under a locally funded public works contract is a municipal affair, the state may not regulate in this area. This argument incorrectly compartmentalizes any law in this area as either a municipal affair or one of statewide concern, something our high court has warned against. (*Cal. Fed. Savings*, *supra*, 54 Cal.3d at p. 17.) The League then uses this compartmentalization to declare charter city law supreme and create a conflict where none exists. Charter city law may be declared "supreme" in a given case, only where: (1) it truly conflicts with state law; and (2) "under the historical circumstances presented," the reviewing court cannot find a "convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession." (*Id.* at p. 18.) Although the *Vista* court determined that wages of contract workers under a locally funded public works contract is a municipal affair, this decision favoring charter cities does not "preclude superseding state legislation in a later case if the fact-bound justification—the statewide dimension—is subsequently demonstrated." (*Ibid.*) The League erroneously stops at the first prong of the analysis.

As respondents noted, the Legislature often provides financial incentives for local governments. For example, the Penal Code provides that municipalities can receive state

11

funds for specified law enforcement purposes, but conditions receipt of the funds on the municipality agreeing to recruitment and training standards established by a specified commission. (Pen. Code, § 13522.) Additionally, cities are not eligible to receive specified state community development funds if they place restrictions on residential construction within the city. (Health & Saf. Code, § 50830.) The trial court found, and we agree, that "[p]ursuing state policy objectives through financial incentives is generally constitutional" given the state's "plenary lawmaking authority over the state's budget." (*Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 602 ["The Legislature has plenary lawmaking authority over the state's budget."].) Moreover, as a general matter, it is not for the courts to interject their own opinion regarding whether section 1782 constitutes good state policy as "we possess neither the expertise nor the prerogative to make policy judgments." (*Nat'l. Fed. of Independ. Bus. v. Sebelius* (2012) ___U.S. ___ [132 S.Ct. 2566, 2579] (*NFIB*).)

Similar to California's plenary lawmaking authority over its state budget, the United States Congress has the power under the spending clause of the federal constitution to grant federal funds to the States and may condition such a grant upon the States taking certain actions. (*NFIB*, *supra*, ___ U.S. at ___ [132 S.Ct. at p. 2601].) "Such measures 'encourage a State to regulate in a particular way, [and] influenc[e] a State's policy choices.' " (*Id.* at 2601-2602.) For example, "in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions. [Citation.] These offers may well induce the States to adopt policies that the Federal Government itself could not impose." (*Id.* at

12

p. 2579.)

In *NFIB*, a plurality of the court noted that the financial inducement chosen by Congress to encourage states to agree to a provision in the Patient Protection and Affordable Care Act expanding health care coverage amounted to "a gun to the head" as a state that opted out of the expansion stood to lose all of its existing Medicaid funding. (*NFIB*, *supra*, ___ U.S. at ___ [132 S.Ct. at pp. 2581-2582, 2604].) In contrast, the *NFIB* court characterized the financial inducement of a state losing five percent of highway funds to encourage a state to raise its drinking age as " 'relatively mild encouragement' " because the federal funds at stake constituted less than half of one percent of the state's budget at the time. (*Id.* at p. 2604.)

In adopting section 1782, the Legislature found, among other things, that (1) section 1782 provides a financial incentive to charter cities that comply with the prevailing wage law, and (2) state funding or financial assistance for charter city construction projects is a small portion of charter city budgets that can be addressed by other revenue sources. (Stats. 2013, ch. 794, § 1, subd. (j).) "[L]egislative findings, while not binding on the courts, are given great weight and will be upheld unless they are found to be unreasonable and arbitrary." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 583.)

The Cities suggest section 1782 amounts to unconstitutional financial coercion as it forces charter cities to relinquish their sovereignty and use their local funds to further the state goal of paying prevailing wages. The Cities presented no evidence to support

13

their claim of financial coercion or show that the Legislative findings were unreasonable and arbitrary; such as, the size of their budgets, the amount of local funding available to them to fund municipal projects without state funding or financial assistance, their ability to raise new revenues to offset the loss of state funding and financial assistance, their past reliance on state funding or financial assistance for municipal construction projects, or the amount of money they might save by not paying prevailing wages.  As the Cities noted below, they may conduct a cost-benefit analysis and decide not to pay prevailing wages on all local projects because it would cost less to refuse to pay prevailing wages in local jobs and forgo state construction funding.  As the parties seeking relief, the Cities had the burden of proving any facts necessary to support their petition for writ of mandate.  (*Cal. Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153.)  Without any evidence showing their dependence on state funding or financial assistance for municipal projects, the Cities' financial coercion argument fails.

Perhaps because the Cities' financial coercion argument lacks any evidentiary support, Counties contends that where a "governmental entity impos[es] a condition that impacts constitutional rights," the government bears the burden "to demonstrate its necessity."  In support of its arguments Counties relies on a number of cases establishing a stringent test for the constitutionality of laws infringing on fundamental constitutional rights.  (*Danskin v. San Diego Unified School Dist.* (1946) 28 Cal.2d 536, 554 [constitutional right to free speech and assembly]; *Bagley v. Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 502-503 [constitutional right to free speech]; *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 213 [constitutional right to privacy].)

14

These cases addressed the unconstitutional conditions doctrine which holds that where the "receipt of a public benefit is conditioned upon the waiver of a constitutional right, the 'government bears a heavy burden of demonstrating the practical necessity for the limitation.' " (*Robbins v. Superior Court*, *supra*, 38 Cal.3d at p. 213.)

Counties provided no authority to support their implied assumption that the right at issue is a fundamental one deserving of such strict scrutiny. As a more basic matter, reliance on this line of cases presupposes that section 1782, in fact, strips charter cities of their constitutional right to exercise "home rule" authority. Section 1782, however, does not require charter cities "to give up or refrain from exercising a constitutional right." (*Cal. Bldg. Indus. Assn v. City of San Jose* (2015) 61 Cal.4th 435, 457.) As we have already discussed, section 1782 does not genuinely conflict with local law, but gives charter cities a meaningful choice.

In an attempt to justify their deficient evidentiary showing, the Cities argue for the first time in their reply brief on appeal that section 1782 is coercive because it fails to identify the state funding or financial assistance charter cities will forgo if they do not follow the prevailing wage law requirements. The Cities contend this "vagueness" makes section 1782 coercive as charter cities cannot meaningfully conduct a cost/benefit analysis of the statutory requirements. The Cities attempt to distinguish section 1782 from other state funding programs that have strings attached (e.g., Pen. Code, § 13522; Health & Saf. Code, § 50830) by arguing section 1782 fails to identify the funds at stake. We reject this argument.

15

As a preliminary matter, respondents seek to strike that portion of the Cities' reply brief arguing that section 1782 is unconstitutionally coercive because it offers no guidance on what type of state funding is at stake on the ground this was not argued in the Cities' opening brief. The Cities oppose the motion asserting the argument is "an elaboration" of the position they argued in their opening brief. We reject the Cities' position that the argument is a mere elaboration. Nonetheless, in the interest of justice, we deny the motion to strike and consider the new argument on its merits.

Statutes must be sufficiently clear to provide a standard for their uniform application. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 231.) The term "state funding or financial assistance" is defined as including "direct state funding, state loans and loan guarantees, state tax credits, and any other type of state financial support for a construction project." (§ 1782, subd. (d)(4).) It "does not include revenues that charter cities are entitled to receive without conditions under the California Constitution." (*Ibid.*) Subsequent legislation clarified that section 1782 does not apply to "[f]unding and financial assistance provided to local governments in response to an emergency" as defined by Government Code section 8558. (Gov. Code, § 8687.9, added by Stats. 2015, ch. 2 (Assem. Bill 92) § 4.)

The Cities point to the phrase that state funding or financial assistance includes "any other type of state financial support for a construction project" to support their vagueness argument. The Cities fail to explain *what* in this phrase is vague or unclear. While this phrase makes the statutory definition of "state funding or financial assistance" extremely broad, the breadth of the definition does not render the language unclear.

16

The Cities question whether "federal funding programs with state involvement (federal pass-through funds)" are or are not included in the definition of "state funding or financial assistance." The Cities also seek to augment the record with a chart of funding programs they claim could potentially be impacted by section 1782. The Cities purportedly rely on the chart to show that the funds listed exist to support their argument that the ambiguity in section 1782 makes it impossible for charter cities to determine the potential financial consequences if they fail to ensure prevailing wages were paid on locally funded projects. The Cities concede that the trial court sustained respondents' objections to the chart and they did not challenge this ruling on appeal. Augmentation is not appropriate under these circumstances. Thus, the Cities' motion to augment is denied.

In any event, the Cities provided no authority to support the proposition that a state statute conditioning the receipt of discretionary state funding must identify the funding programs impacted to be valid. Rather, to be valid, a funding condition must be unambiguous so a knowing choice can be made on what needs to be done to satisfy the funding condition. (*Pennhurst St. Sch. & Hosp. v. Halderman* (1981) 451 U.S. 1, 17.) As the *Pennhurst* court noted, "legislation enacted pursuant to the [federal] spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' [Citations.] There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of

17

federal moneys, it must do so unambiguously." (*Id.* at p. 17.)  Here, section 1782 unambiguously provides that to receive discretionary state construction funding charter cities must require contractors on all their public works projects pay prevailing wages. That section 1782 does not identify the funding that might be at issue is of no import.  If a charter city requests funding for a municipal construction project and is denied funding on the basis it is not eligible for those particular funds under section 1782, the parties may litigate the issue.

Finally, the Cities assert *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 (*Sonoma County*) supports their coercion argument as this case holds that the Legislature is prohibited from conditioning a charter city's receipt of state funds on that city relinquishing its power to control its municipal affairs.  In other words, the Legislature may condition the granting of a privilege, including financial assistance, but the Legislature may not impose a condition to attain an unconstitutional result.  (*Id.* at p. 319.)

At issue in *Sonoma County* was the Legislature's enactment of Government Code section 16280, which prohibited the distribution of state surplus or loan funds to any local public agency that granted to its employees a cost-of-living wage or salary increase for the 1978-1979 fiscal year which exceeded the cost-of-living increase provided for state employees.  (*Sonoma County*, *supra*, 23 Cal.3d 296 at p. 302.)  The statute also declared "null and void any agreement by a local agency to pay a cost-of-living increase in excess of that granted to state employees." (*Ibid.*)  In *Sonoma County*, our high court addressed whether Government Code section 16280 impaired the obligation of contracts in

18

violation of the federal and state constitutions and the "home rule" provisions of the state Constitution. (*Sonoma County*, at p. 302.)

Our high court first concluded that Government Code section 16280 unconstitutionally impaired existing contracts by declaring them null and void. (*Sonoma County*, *supra*, 23 Cal.3d 296 at pp. 303-315.) The court next addressed whether Government Code section 16280 violated the "home rule" provision of the California Constitution because it interfered with the rights of chartered cities and counties to determine the compensation of their employees. (*Id*. at p. 314.) The court stated [t]here can be no doubt that there is a conflict between the provision of [Government Code] section 16280 invalidating wage increases agreed to by cities and counties and the ordinances or resolutions of the local agencies which ratified the agreements." (*Id.* at p. 315.)

The court then addressed whether the condition in Government Code section 16280 "that state funds are to be granted only to those local agencies which do not pay salary increases may be upheld in spite of [its] conclusion that the provision invalidating agreements for such increases is unconstitutional." (*Sonoma County*, *supra*, 23 Cal.3d 296 at pp. 318-319.) On this point, the court noted " 'constitutional power [could not] be used by way of condition to attain an unconstitutional result' " to conclude the state could not require as a condition of granting funds that the local agencies impair valid contracts to pay wage increases. (*Id.* at p. 319.) The court then found the condition in question invalid as applied to city and county employees who were not entitled to a wage increase by contract, noting the Legislature intended to treat all local government employees and

19

officers in a uniform manner and distinguishing application of the condition between employees who had a contractual right to a wage increase and those who did not violated that intention.  (*Ibid.*)

The Cities and the League rely on this latter portion of *Sonoma County* for the proposition that the Legislature has used its constitutional power (enacting section 1782) to obtain an unconstitutional result (requiring charter cities to give up its constitutional "home rule" power over their municipal affairs and comply with the prevailing wage law).  *Sonoma County* does not advance the Cities' argument as the state statute at issue in *Sonoma County* conflicted with agreements made by cities and counties and the ordinances or resolutions of the local agencies ratifying the agreements and thus led to the unconstitutional result of impairing existing contracts and the "home rule" authority of charter cities.  (*Sonoma County*, *supra*, 23 Cal.3d at pp. 314, 315.)  Here, there is no conflict between section 1782 and the Cities' resolutions or ordinances.  Because no conflict exists between section 1782 and the Cities' laws, we need not reach the questions whether section 1782 addresses a matter of statewide concern or whether section 1782 is reasonably related to the resolution of that concern and narrowly tailored to avoid unnecessary interference in local governance.  (*Vista*, *supra*, 54 Cal.4th at p. 556.)

2.  Article XIII, section 24(b)

In November 2010, California voters passed Proposition 22, which amended the California Constitution to provide that "[t]he Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes."  (Cal.

20

Const., art. XIII, § 24, subd. (b), as added by Prop. 22, Gen. Elec. (Nov. 2, 2010), § 3.) The Cities assert section 1782 violates article XIII, section 24, subdivision (b) of the California Constitution because it unconstitutionally restricts the use of the proceeds of taxes imposed by charter cities by requiring local funds be used for the payment of prevailing wages instead of being used for another aspect of the project of a city's choosing. The Cities tacitly concede section 1782 does not expressly require charter cities to pay prevailing wages; rather, they assert the coercive nature of section 1782 restricts the use of local revenues as it operates to force the payment of prevailing wages on locally funded public works projects.

As discussed above, we concluded section 1782 did not conflict with charter city law and rejected the Cities' argument that section 1782 is coercive. (*Ante*, pt. II.B.2.) Accordingly, we reject the Cities' contention that section 1782 violates article XIII, section 24, subdivision (b) of the California Constitution.

3. Response to Dissent

We agree with the statement of our dissenting colleague that "our home rule jurisprudence does not appear to turn on the difference between state incentives and state coercion . . . " (Dissent at pt. B.) In their opening brief the Cities argued section 1782 amounted to financial coercion. Because the Cities raised the issue, respondents necessarily responded to the argument and we addressed it.

The "home rule" doctrine provides that with respect to municipal affairs, city charters "supersede all laws inconsistent therewith." (Cal. Const. Art. XI, § 5(a).) Once it is determined that the matter at hand constitutes a municipal affair the relevant inquiry

21

is whether there is a conflict between state law and charter city law. (*Vista*, *supra*, 54 Cal.4th at p. 556.) If there is no conflict between state law and charter city law, the analysis is complete. (*Cal. Fed. Savings*, *supra*, 54 Cal.3d at p. 16.)

Here, the majority in *Vista* concluded that the wage levels of contract workers constructing locally funded public works are a municipal affair. (*Vista*, *supra*, 54 Cal.4th at p. 558.) We are bound by this conclusion. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, unlike *Vista*, there is no genuine conflict between section 1782 and charter city law. Accordingly, the "home rule" provision of the California Constitution does not bar the application of section 1782 to charter cities. We disagree with our dissenting colleague's conclusion that *Sonoma County* is analogous. (Dissent at pt. A.) In that case a conflict existed between state law and charter city law. (*Sonoma County*, *supra*, 23 Cal.3d at p. 315.) No such conflict exists here.

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


McINTYRE, J.

I CONCUR:


McCONNELL, P. J.

BENKE, J., dissenting.

The majority has determined that Labor Code section 1782 merely creates a fiscal "incentive," which they find encourages, but does not coerce, charter cities and counties to forego to their rights under the home rule provisions of our state Constitution (Cal. Const., art. XI, § 5) and comply with the otherwise inapplicable provisions of the prevailing wage law, Labor Code section 1700 et seq. (See maj. opn., at pp. 12-14.) I have two problems with this conclusion. First, there is no authority which holds that the Legislature may attempt to obtain such a waiver of constitutional rights from municipalities by way of incentives as opposed to outright fiscal coercion. Indeed what authority exists with respect to fiscal incentives strongly suggests that where municipal activity is protected by the home rule provisions of the Constitution, the state may not use its fiscal power as a means of inducing a waiver of that protection. (See *Sonoma County Org. of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 316-317 (*Sonoma County*).)

Second, in the most recent federal case that has considered whether the federal government has used its fiscal power to coerce states rather than provide them with a meaningful opportunity to choose the federal government's preferred course of action (*Nat'l Fed'n of Indep. Bus. v. Sebelius* (2012) ___U.S.___ [132 S.Ct. 2566, 2579] (*NFIB*)), a plurality made it clear that intergovernmental coercion arises when a subordinate organ of government is not able to make a knowing and voluntary choice with respect to the benefits being offered by the more dominant organ. Labor Code section 1782 gives municipalities no realistic means of knowing the future impact of their

choice to exercise their rights under the home rule provisions of our Constitution. Given the inherent uncertainties surrounding completion of large scale infrastructure projects and, in particular, tremendous fiscal risks involved, Labor Code section 1782 cannot be described as anything other than coercive.

In a host of areas—such as climate change regulation, immigrant law enforcement policy, housing, and the provision of local minimum wages—the municipal independence and innovation protected by article XI, section 5 of the Constitution provide municipalities with important, valuable, and varied opportunities to protect the safety and promote the welfare of their residents. By giving the Legislature an indirect means of achieving what it may not do directly in one relatively narrow area—prevailing wages on construction projects—the majority opinion substantially weakens that independence and innovation in an innumerable number of other fields where a future Legislature may be hostile to local experimentation and interests.

A. Incentives

The Supreme Court's holding in *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 566 (*Vista*) made it abundantly clear that the state has no valid interest in what employees working on municipal projects financed solely by way of municipal funds are paid: "[N]o statewide concern has been presented justifying the state's regulation of the wages that charter cities require their contractors to pay to workers hired to construct locally funded public works." (*Ibid.*) In the absence of such a statewide concern, the home rule provisions of the Constitution prevent the Legislature from directly interfering with a charter city's decision to leave to

2

the marketplace the compensation to be paid on local construction projects. (*Id*. at p. 556; see also *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 17 (*California Fed. Savings*).)

In somewhat analogous circumstances, the court it *Sonoma County*, held that what the Legislature may not do directly, it may not do indirectly by way of fiscal inducement. In 1978, following the voters' enactment of Proposition 13, municipalities and school districts were facing a fiscal crisis because the real property taxes that had been financing their operations had been drastically reduced by the voters. The Legislature, which controlled a state budget with a substantial surplus, promptly enacted a number of remedial measures. One measure required that, as a condition of receiving much need financial assistance from the state, municipalities refrain from giving their employees any cost-of-living increase that exceeded increases the Legislature had provided state employees. Employees of Sonoma County challenged this condition on the grounds it impermissibly interfered with labor agreements municipalities had made with employee unions. Our Supreme Court agreed and stated: "It is too well established to require extensive citation of authority that, while the state may impose conditions upon the granting of a privilege, including restrictions upon the expenditure of funds distributed by it to other governmental bodies [citations], 'constitutional power cannot be used by way of condition to attain an unconstitutional result.' " (*Sonoma County*, *supra*, 23 Cal.3d at p. 319.) Neither I, nor the majority, have been able to locate any authority that would make any exception to this principle in the case of the home rule doctrine embodied in article XI, section 5 of the Constitution.

3

In this regard, I think it is of particular significance that in unambiguously upholding the right of municipalities to control wages paid on local projects, in *Vista* the Supreme Court expressly found there is no statewide concern on that subject. In light of that holding, whether a financial condition is an incentive or coercion is of no moment. The state, we have been told, has no interest in the subject of wages paid by municipalities on local projects. Thus, any financial discrimination against municipalities who exercise their rights—whether the discrimination is only an incentive or amounts to coercion—is inconsistent with the home rule doctrine and cannot be tolerated on the grounds it advances any legitimate interest of the state. It advances no legitimate state concern.

B. Coercion

Although our home rule jurisprudence does not appear to turn on the difference between state incentives and state coercion, in considering the distinct relationship between the federal and state government, and when and under what circumstances the federal government may attempt to influence the decisions of states over matters within their delegated or implied powers, the United States Supreme Court has determined that although the federal government may use fiscal incentives to influence state behavior, in a given context federal inducements may amount to improper coercion. (See *NFIB*, *supra*, ___U.S. ___ [132 S.Ct. 2566].)

In *NFIB*, the plaintiffs challenged a number of provisions of the Affordable Care Act (ACA), including a provision that made, as a condition of continuing *any* federal subsidy to state Medicaid programs, each states' agreement to substantially expand the

4

program beyond its general provision for payment of the medical expenses of individuals and families who have household incomes at or below established poverty levels. The Supreme Court found this provision was an improper intrusion on the states' sovereignty because as a practical fiscal matter it left states with no choice other than to agree to the federally desired Medicaid expansion. In finding that this was coercive the court stated: "[O]ur cases have recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives. 'We have repeatedly characterized . . . Spending Clause legislation as "much in the nature of a *contract*." [Citations.] The legitimacy of Congress's exercise of the spending power 'thus rests on whether the State *voluntarily and knowingly* accepts the terms of the "contract." ' " (*NFIB*, *supra*, 132 S.Ct. at p. 2602, second italics added.) Because of the catastrophic loss states would incur in the event all of their federal Medicaid funding was discontinued—in many cases up to 10 percent of their total budgets—the court found the condition could not be characterized as voluntary. (*Id*. at pp. 2604-2605.)

Admittedly, the coercion Labor Code section 1782 effects is less dramatic than the Medicaid condition considered in *NFIB*. Nonetheless, Labor Code section 1782 is coercive because as a practical matter its plainly robs municipalities of any real choice other than to apply the prevailing wage law to purely municipal projects. The coercion arises because municipalities that have ordinances or charter provisions that permit bids by contractors who do not meet the requirements of the prevailing wage law have no realistic means of determining how much in state aid will be lost by their choice or how long needed infrastructure will be delayed if they later choose, by the act of the governing

5

body, or as may be needed, a vote of the people, to comply with the Legislature's desires.

The two-year ban on state aid when municipalities have awarded a contract that does not meet the requirements of the prevailing wage law is particularly coercive. (See Lab. Code, § 1782, subd. (b).) Under Labor Code section 1782, subdivision (b), when a municipality makes such an award, it is gambling that in the next two years it will not have urgent need for state assistance on some other larger and more important project for which it is willing or has already agreed to comply with the prevailing wage law. Given the reality that unknown infrastructure needs may arise or that planned projects that are compliant because they are federally financed may experience serious cost overruns and urgently need state assistance, no municipality governed by prudent executives and legislative bodies would take such a gamble. It takes no imagination to recognize that, by the statute's own terms, a noncompliant $50,000 bike path contract in one year could shortly thereafter imperil a city's ability to finance a multimillion-dollar wetland restoration project or a wireless network improvement.

In sum, the substantial risks that Labor Code section 1782 imposes on municipalities deprive them of any ability to make a knowing and voluntary choice to exercise their rights under article X1, section 5 of our Constitution. Thus, it cannot be seen as anything other than coercive.

C. Home Rule

As I indicated at the outset, the majority, by permitting the Legislature to do indirectly what our Supreme Court has said it may not do directly, creates a precedent that will inhibit municipal innovation in any number of other fields. Whenever a

6

particular community attempts to develop a response to a particular problem, whether it is homelessness, drug treatment, water conservation, or immigrant law enforcement, the proponents of the local solution will have far less freedom in doing so, because they will know that in the end, if their solution is not popular in Sacramento, they can be made to pay a price. In diminishing the vigor with which the home rule doctrine protects local prerogatives, the majority opinion is not only inconsistent with our Supreme Court's home rule jurisprudence, it is unwise.

BENKE, J.