Opinion
McINTYRE, J.
In 2013, the Legislature adopted Labor Code section 1782, which prohibits a charter city from receiving or using state funding or financial assistance for a public construction project if the city has a charter provision or ordinance that authorizes a contractor to not comply with the state prevailing wage laws. (Lab. Code, § 1782, subd. (a), added by Stats. 2013, ch. 794, § 2.) (Undesignated statutory references are to the Labor Code.) In this case, we affirm a judgment upholding the constitutionality of section 1782 against a “home rule” challenge brought by a number of charter cities.
FACTUAL AND PROCEDURAL BACKGROUND
Five charter cities, the Cities of El Centro, Fresno, Vista, Carlsbad and El Cajon (the Cities), filed a petition for an alternative or peremptory writ of mandate and complaint for declaratory and injunctive relief against defendants the State of California, David Lanier in his official capacity as the Secretary of the Labor and Workforce Development Agency, Christine Baker in her official capacity as the Director of Industrial Relations and Julie A. Su in her official capacity as the Labor Commissioner. (The City of Oceanside was also a plaintiff, but is not a party to this appeal.) The trial court subsequently allowed the State Building & Construction Trades Council of California (Trades Council) to intervene in the action. (Defendants and Trades Council are collectively referred to as respondents.) We granted the applications of League of California Cities (League), California State Association of Counties (Counties) and Associated Builders & Contractors of California to file amicus curiae briefs on behalf of the Cities. We also granted the application of the California State Legislature to file an amicus curiae brief on behalf of respondents.
Among other things, the Cities sought a writ of mandate to prevent the enforcement of section 1782. The trial court denied relief and entered a judgment in favor of defendants. The Cities timely appealed and filed a petition for a writ of supersedeas to prevent section 1782 from going into *1501 effect. We denied the petition. On appeal, the Cities limit their challenge to the extent the trial court denied relief under article XI, section 5, subdivision (a) and article XIII, section 24, subdivision (b) of the California Constitution.
DISCUSSION
I. Background
Since 1931, California has had some form of a prevailing wage law. (State Building & Construction Trades Council of California v. City of Vista (2012) 54 Cal.4th 547, 554 [143 Cal.Rptr.3d 529, 279 P.3d 1022] (Vista).) The current prevailing wage law requires that contractors on public works projects pay their employees the general prevailing rate of per diem wages. (§§ 1770, 1773.) Contractors must also hire apprentices enrolled in state-approved apprenticeship programs to perform at least a certain percentage of the work and make monetary contributions for apprenticeship training. (§ 1777.5, subds. (c), (g) & (m)(l).) The purpose of the prevailing wage law “is to benefit and protect employees on public works projects,” including “to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees.” (Lusardi Construction Co. v. Aubry (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].)
The California Constitution, however, provides that the ordinances of charter cities supersede state law with respect to “municipal affairs.” (Cal. Const., art. XI, § 5, subd. (a).) “[T]his constitutional ‘home rule’ doctrine reserves to charter cities the right to adopt and enforce ordinances that conflict with general state laws, provided the subject of the regulation is a ‘municipal affair’ rather than one of ‘statewide concern.’ ” (Traders Sports, Inc. v. City of San Leandro (2001) 93 Cal.App.4th 37, 45 [112 Cal.Rptr.2d 677].)
The majority in Vista concluded that wage levels of contract workers constructing locally funded public works are a municipal affair. (Vista, supra, 54 Cal.4th at p. 558.) At issue in Vista was a state law that required a charter city to comply with California’s prevailing wage laws and a charter city ordinance prohibiting compliance with that law. (Id. at pp. 560-561.) An actual conflict existed because state law required what the charter city law prohibited. (Id. at pp. 559-560.) Based upon principles of the home rule doctrine, the Vista court held that the wage levels of contract workers constructing locally funded public works are a municipal affair and exempt *1502 from state regulation as these wage levels are not a statewide concern subject to state legislative control. (Id. at p. 556.) Nonetheless, the Vista court noted “that the state could use its own resources to support wages and vocational training in the state’s construction industry.” (Id. at p. 562.)
In 2013, in response to Vista, the Legislature adopted section 1782 “to provide a financial incentive for charter cities to require contractors on their municipal construction projects to comply with the state’s prevailing wage law by making these charter cities eligible to receive and use state funding or financial assistance for their construction projects.” (Stats. 2013, ch. 794, § l(j).) The Legislature noted that the bill does not address what is or is not a municipal affair and instead addresses how state funds can be used by charter cities. (Senate Com. on Labor and Industrial Relations, Analysis of Sen. Bill No. 7 (2013-2014 Reg. Sess.) as introduced Feb. 19, 2013, p. 6. (Bill Analysis) available online at <http://www.leginfo.ca.gov/pub/13-14/bill/sen/sb_0001-0050/sb_7_cfa_20130312_095142_sen_comm.html> [as of Mar. 29, 2016].)
Generally, section 1782 provides that a charter city is ineligible to receive “state funding or financial assistance” on a construction project if either (a) the city has a charter provision or ordinance that authorizes a contractor not to pay prevailing wages on a public works contract or (b) the city has awarded, within the past two years, a public works contract without requiring the contractor to pay prevailing wages. (§ 1782, subds. (a), (b).) Section 1782 does not apply to funds or contracts awarded prior to January 1, 2015 (§ 1782, subd. (f)), nor to contracts for construction projects of $25,000 or less, or contracts for alteration, demolition, repair, or maintenance projects of $15,000 or less (§ 1782, subd. (d)(1)).
The Legislature made extensive findings when it adopted section 1782. It found that having an available workforce of skilled construction workers to efficiently complete both public and private infrastructure projects and maintaining such a workforce through the continual training of new workers to replace the aging workforce, presents a matter of statewide concern. (Stats. 2013, ch. 794, § 1(a).) The Legislature found that cities that require compliance with the prevailing wage law on all their public works projects (1) create a substantial benefit that goes beyond the limits of the city as many of the workers employed on a municipal project do not live in the city where the project is located and many apprentices receiving training on municipal projects will pursue careers outside the city and (2) further the state’s goal to create and maintain good jobs and training opportunities in the construction industry to preserve the middle class. (Id., subds. (g) & (i).) The Legislature noted that the state has limited financial resources to support local construction projects and providing financial assistance to only those charter cities *1503 that require compliance with the prevailing wage law on all their municipal construction projects furthers state policy. (Id., subd. (h).) “To the extent that requiring compliance with the state’s prevailing wage law may raise the cost of municipal projects for these cities, these cities also would be more in need of state financial support for their other construction projects.” (Ibid.) The Legislature stated that it intended “to provide a financial incentive” to charter cities that comply with the prevailing wage law on their municipal construction projects “by making these charter cities eligible to receive and use state funding or financial assistance for their construction projects.” (Id., subd. (j).) The Legislature found that state funding or financial assistance for charter city construction projects “makes up only a small portion of charter city budgets, and charter cities have the power to raise other revenues if they do not wish to require the payment of prevailing wages on all their municipal construction projects.” (Ibid.)
II. The Cities’ Claims
A. Standard of Review
In reviewing the Cities’ claims, “ ‘all intendments favor the exercise of the Legislature’s plenary authority’ ” and any doubt as to the Legislature’s power to act should be resolved in favor of the Legislature’s action. (California Redevelopment Assn. v. Matosantos (2011) 53 Cal.4th 231, 253 [135 Cal.Rptr.3d 683, 267 P.3d 580].) The Legislature may exercise “ ‘any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution.’ ” (Id. at p. 254.) Thus, we look to the Constitution to determine whether the Legislature is prohibited to act, not whether it is authorized to do an act. (Matosantos, at p. 254.) We accord “ ‘great weight’ ” to the Legislature’s evaluation of what constitutes a matter of statewide concern. (Baggett v. Gates (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874].) We are also required to “defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution.” (California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 24 [283 Cal.Rptr. 569, 812 P.2d 916] (Cal. Fed. Savings).)
Where the Legislature has enacted a statute with constitutional prescriptions clearly in mind, the presumption of constitutionality accorded to legislative acts is particularly appropriate as “the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision.” (Pac. Legal Found. v. Brown (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215].) “Although the ultimate constitutional interpretation must rest, of course, with the judiciary [citation], a focused legislative judgment on the question enjoys significant weight and deference by the courts.” (Ibid.)
*1504 In reviewing the trial court’s ruling on a writ of mandate, we generally examine whether the trial court’s findings are supported by substantial evidence. (Bernard v. City of Oakland (2012) 202 Cal.App.4th 1553, 1559 [136 Cal.Rptr.3d 578].) To the extent the case presents a question of statutory construction, we review the matter de novo. (Ibid.)
B. Analysis
The Cities contend section 1782 violates two provisions of the state Constitution: article XI, section 5, subdivision (a), which provides home rule authority to charter cities, and article XIII, section 24, subdivision (b), which prevents the Legislature from restricting the use of local tax revenues. We address each argument in turn.
1. Article XI, section 5, subdivision (a)
Charter cities “may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.” (Cal. Const., art. XI, § 5, subdivision (a).) “City charters adopted pursuant to this Constitution shall . . . with respect to municipal affairs . . . supersede all laws inconsistent therewith.” (Ibid.)
A three-pronged analysis applies to resolve whether a matter falls within the home rule authority of a charter city. We first determine whether the city ordinance at issue regulates an activity that can be characterized as a municipal affair. (Vista, supra, 54 Cal.4th at p. 556.) We then determine whether the case presents an actual conflict between local and state law. (Ibid.) Finally, we must decide whether the state law addresses a matter of statewide concern and determine whether the law is reasonably related to the resolution of that concern and narrowly tailored to avoid unnecessary interference in local governance. (Ibid.)
If no conflict exists, the analysis is complete and we do not reach the third prong. (Cal. Fed. Savings, supra, 54 Cal.3d at p. 16.) As our high court noted, “many opinions purportedly involving competing state and local enactments do not present a genuine conflict. To the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of constitutional law, they ought to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other.” (Id. at pp. 16-17.)
The wages of contract workers under a locally funded public works contract constitute a municipal affair. (Vista, supra, 54 Cal.4th at p. 558.)
*1505 Accordingly, we must proceed to the next step in the analysis to determine whether an actual conflict exists between state law and charter city law. The Cities contend a conflict exists between section 1782 and the Cities’ power over their municipal affairs. While the Cities acknowledge the state may impose conditions upon its funding of local construction projects, they assert section 1782 usurps the constitutional authority of charter cities and penalizes charter cities for exercising their constitutionally protected right over municipal affairs. The trial court found no conflict existed between section 1782 and charter city law, noting it is generally constitutional for a state to pursue its policy objectives through financial incentives.
The question whether an actual conflict exists between state law and charter city law presents a matter of statutory construction. (Vista, supra, 54 Cal.4th at p. 559.) Charter city law is contradictory to state law when it is inimical thereto. (City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc. (2013) 56 Cal.4th 729, 743 [156 Cal.Rptr.3d 409, 300 P.3d 494].) “[N]o inimical conflict will be found where it is reasonably possible to comply with both the state and local laws.” (Ibid.)
Here, the Cities have regulations or ordinances that prohibit or do not require the payment of prevailing wages for the construction of their public works projects. Section 1782 does not conflict with these charter city laws as it does not mandate or require that charter cities do anything, such as paying prevailing wages for its public works projects. Rather, section 1782 provides the Cities with a choice, to meet the requirements set forth in section 1782 to obtain state funding or financial assistance on its public works projects, or forgo eligibility for those funds. For this reason, Counties’ attempt to analogize section 1782 with government funding for mandated services is inapt.
The League asserts an actual conflict exists because section 1782 seeks to enter into a field governed exclusively by a charter city’s plenary, home rule authority. In other words, the League asserts that, because the wages of contract workers under a locally funded public works contract is a municipal affair, the state may not regulate in this area. This argument incorrectly compartmentalizes any law in this area as either a municipal affair or one of statewide concern, something our high court has warned against. (Cal. Fed. Savings, supra, 54 Cal.3d at p. 17.) The League then uses this compartmentalization to declare charter city law supreme and create a conflict where none exists. Charter city law may be declared “supreme” in a given case, only where (1) it truly conflicts with state law and (2) “under the historical circumstances presented,” the reviewing court cannot find a “convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession.” (Id. at p. 18.) Although the Vista *1506 court determined that wages of contract workers under a locally funded public works contract is a municipal affair, this decision favoring charter cities does not “preclude superseding state legislation in a later case if the fact-bound justification — the statewide dimension — is subsequently demonstrated.” (Ibid.) The League erroneously stops at the first prong of the analysis.
As respondents noted, the Legislature often provides financial incentives for local governments. For example, the Penal Code provides that municipalities can receive state funds for specified law enforcement purposes, but conditions receipt of the funds on the municipality agreeing to recruitment and training standards established by a specified commission. (Pen. Code, § 13522.) Additionally, cities are not eligible to receive specified state community development funds if they place restrictions on residential construction within the city. (Health & Saf. Code, § 50830.) The trial court found, and we agree, that “[pjursuing state policy objectives through financial incentives is generally constitutional” given the state’s “plenary lawmaking authority over the state’s budget.” (See Shaw v. People ex rel. Chiang (2009) 175 Cal.App.4th 577, 602 [96 Cal.Rptr.3d 379] [“The Legislature has plenary lawmaking authority over the state’s budget . . . .”].) Moreover, as a general matter, it is not for the courts to interject their own opinion regarding whether section 1782 constitutes good state policy as “we possess neither the expertise nor the prerogative to make policy judgments.” (National Federation of Independent Business v. Sebelius (2012) 567 U.S. _ [183 L.Ed.2d 450, 132 S.Ct. 2566, 2579] (NFIB).)
Similar to California’s plenary lawmaking authority over its state budget, the United States Congress has the power under the spending clause of the federal Constitution to grant federal funds to the States and may condition such a grant upon the States taking certain actions. (NFIB, supra, 567 U.S. at _ [132 S.Ct. at p. 2601].) “Such measures ‘encourage a State to regulate in a particular way, [and] influenc[e] a State’s policy choices.’ ” (Id. at p. _ [132 S.Ct. at pp. 2601-2602].) For example, “in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions. [Citation.] These offers may well induce the States to adopt policies that the Federal Government itself could not impose.” (Id. at p. ___ [132 S.Ct. at p. 2579].)
In NFIB, a plurality of the court noted that the financial inducement chosen by Congress to encourage states to agree to a provision in the Patient Protection and Affordable Care Act (Pub.L. No. 111-148 (Mar. 23, 2010) 124 Stat. 119) expanding health care coverage amounted to “a gun to the head” as a state that opted out of the expansion stood to lose all of its existing Medicaid funding. (NFIB, supra, 567 U.S. at p. _ [132 S.Ct. at pp. 2581-2582, *1507 2604].) In contrast, the NFIB court characterized the financial inducement of a state losing 5 percent of highway funds to encourage a state to raise its drinking age as “ ‘relatively mild encouragement’ ” because the federal funds at stake constituted less than half of 1 percent of the state’s budget at the time. (Id. at p. _ [132 S.Ct. at p. 2604].)
In adopting section 1782, the Legislature found, among other things, that (1) section 1782 provides a financial incentive to charter cities that comply with the prevailing wage law, and (2) state funding or financial assistance for charter city construction projects is a small portion of charter city budgets that can be addressed by other revenue sources. (Stats. 2013, ch. 794, § l(j).) “[Legislative findings, while not binding on the courts, are given great weight and will be upheld unless they are found to be unreasonable and arbitrary.” (California Housing Finance Agency v. Elliott (1976) 17 Cal.3d 575, 583 [131 Cal.Rptr. 361, 551 P.2d 1193].)
The Cities suggest section 1782 amounts to unconstitutional financial coercion as it forces charter cities to relinquish their sovereignty and use their local funds to further the state goal of paying prevailing wages. The Cities presented no evidence to support their claim of financial coercion or to show that the legislative findings were unreasonable and arbitrary, such as, the size of their budgets, the amount of local funding available to them to fund municipal projects without state funding or financial assistance, their ability to raise new revenues to offset the loss of state funding and financial assistance, their past reliance on state funding or financial assistance for municipal construction projects, or the amount of money they might save by not paying prevailing wages. As the Cities noted below, they may conduct a cost-benefit analysis and decide not to pay prevailing wages on all local projects because it would cost less to refuse to pay prevailing wages in local jobs and forgo state construction funding. As the parties seeking relief, the Cities had the burden of proving any facts necessary to support their petition for writ of mandate. (California Correctional Peace Officers Assn. v. State Personnel Bd. (1995) 10 Cal.4th 1133, 1153 [43 Cal.Rptr.2d 693, 899 P.2d 79].) Without any evidence showing their dependence on state funding or financial assistance for municipal projects, the Cities’ financial coercion argument fails.
Perhaps because the Cities’ financial coercion argument lacks any evidentiary support, Counties contends that where a “governmental entity impos[es] a condition that impacts constitutional rights,” the government bears the burden “to demonstrate its necessity.” In support of its arguments Counties relies on a number of cases establishing a stringent test for the constitutionality of laws infringing on fundamental constitutional rights. (Danskin v. San Diego Unified School Dist. (1946) 28 Cal.2d 536, 554 *1508 [171 P.2d 885] [constitutional right to free speech and assembly]; Bagley v. Washington Township Hospital Dist. (1966) 65 Cal.2d 499, 502-503 [55 Cal.Rptr. 401, 421 P.2d 409] [constitutional right to free speech]; Robbins v. Superior Court (1985) 38 Cal.3d 199, 213 [211 Cal.Rptr. 398, 695 P.2d 695] [constitutional right to privacy].) These cases addressed the unconstitutional conditions doctrine which holds that where the “receipt of a public benefit is conditioned upon the waiver of a constitutional right, the ‘government bears a heavy burden of demonstrating the practical necessity for the limitation.’ ” (Robbins v. Superior Court, supra, 38 Cal.3d at p. 213.)
Counties provided no authority to support their implied assumption that the right at issue is a fundamental one deserving of such strict scrutiny. As a more basic matter, reliance on this line of cases presupposes that section 1782, in fact, strips charter cities of their constitutional right to exercise home rule authority. Section 1782, however, does not require charter cities “to give up or refrain from exercising a constitutional right.” (California Building Industry Assn. v. City of San Jose (2015) 61 Cal.4th 435, 457 [189 Cal.Rptr.3d 475, 351 P.3d 974].) As we have already discussed, section 1782 does not genuinely conflict with local law, but gives charter cities a meaningful choice.
In an attempt to justify their deficient evidentiary showing, the Cities argue for the first time in their reply brief on appeal that section 1782 is coercive because it fails to identify the state funding or financial assistance charter cities will forgo if they do not follow the prevailing wage law requirements. The Cities contend this “vagueness” makes section 1782 coercive as charter cities cannot meaningfully conduct a cost/benefit analysis of the statutory requirements. The Cities attempt to distinguish section 1782 from other state funding programs that have strings attached (e.g., Pen. Code, § 13522; Health & Saf. Code, § 50830) by arguing section 1782 fails to identify the funds at stake. We reject this argument.
As a preliminary matter, respondents seek to strike that portion of the Cities’ reply brief arguing that section 1782 is unconstitutionally coercive because it offers no guidance on what type of state funding is at stake on the ground this was not argued in the Cities’ opening brief. The Cities oppose the motion asserting the argument is “an elaboration” of the position they argued in their opening brief. We reject the Cities’ position that the argument is a mere elaboration. Nonetheless, in the interest of justice, we deny the motion to strike and consider the new argument on its merits.
Statutes must be sufficiently clear to provide a standard for their uniform application. (Morrison v. State Board of Education (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].) The term “state funding *1509 or financial assistance” is defined as including “direct state funding, state loans and loan guarantees, state tax credits, and any other type of state financial support for a construction project.” (§ 1782, subd. (d)(4).) It “does not include revenues that charter cities are entitled to receive without conditions under the California Constitution.” {Ibid.) Subsequent legislation clarified that section 1782 does not apply to “[f]unding and financial assistance provided to local governments in response to an emergency” as defined by Government Code section 8558. (Gov. Code, § 8687.9, added by Stats. 2015, ch. 2, § 4.)
The Cities point to the phrase that state funding or financial assistance includes “any other type of state financial support for a construction project” to support their vagueness argument. The Cities fail to explain what in this phrase is vague or unclear. While this phrase makes the statutory definition of “state funding or financial assistance” extremely broad, the breadth of the definition does not render the language unclear.
The Cities question whether “federal funding programs with state involvement (federal pass-through funds)” are or are not included in the definition of “state funding or financial assistance.” The Cities also seek to augment the record with a chart of funding programs they claim could potentially be impacted by section 1782. The Cities purportedly rely on the chart to show that the funds listed exist to support their argument that the ambiguity in section 1782 makes it impossible for charter cities to determine the potential financial consequences if they fail to ensure prevailing wages were paid on locally funded projects. The Cities concede that the trial court sustained respondents’ objections to the chart and they did not challenge this ruling on appeal. Augmentation is not appropriate under these circumstances. Thus, the Cities’ motion to augment is denied.
In any event, the Cities provided no authority to support the proposition that a state statute conditioning the receipt of discretionary state funding must identify the funding programs impacted to be valid. Rather, to be valid, a funding condition must be unambiguous so a knowing choice can be made on what needs to be done to satisfy the funding condition. (Pennhurst State School v. Halderman (1981) 451 U.S. 1, 17 [67 L.Ed.2d 694, 101 S.Ct. 1531].) As the Pennhurst court noted, “legislation enacted pursuant to the [federal] spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress’ power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the ‘contract.’ [Citations.] There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the *1510 grant of federal moneys, it must do so unambiguously.” (Ibid..) Here, section 1782 unambiguously provides that to receive discretionary state construction funding charter cities must require contractors on all their public works projects to pay prevailing wages. That section 1782 does not identify the funding that might be at issue is of no import. If a charter city requests funding for a municipal construction project and is denied funding on the basis it is not eligible for those particular funds under section 1782, the parties may litigate the issue.
Finally, the Cities assert Sonoma County Organization of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] (Sonoma County) supports their coercion argument as this case holds that the Legislature is prohibited from conditioning a charter city’s receipt of state funds on that city relinquishing its power to control its municipal affairs. In other words, the Legislature may condition the granting of a privilege, including financial assistance, but the Legislature may not impose a condition to attain an unconstitutional result. (Id. at p. 319.)
At issue in Sonoma County was the Legislature’s enactment of Government Code section 16280, which prohibited the distribution of state surplus or loan funds to any local public agency that granted to its employees a cost-of-living wage or salary increase for the 1978 to 1979 fiscal year which exceeded the cost-of-living increase provided for state employees. (Sonoma County, supra, 23 Cal.3d 296 at p. 302.) The statute also declared “null and void any agreement by a local agency to pay a cost-of-living increase in excess of that granted to state employees.” (Ibid.) In Sonoma County, our high court addressed whether Government Code section 16280 impaired the obligation of contracts in violation of the federal and state Constitutions and the home rule provisions of the state Constitution. (Sonoma County, at p. 302.)
Our high court first concluded that Government Code section 16280 unconstitutionally impaired existing contracts by declaring them null and void. (Sonoma County, supra, 23 Cal.3d at pp. 303-315.) The court next addressed whether Government Code section 16280 violated the home rule provision of the California Constitution because it interfered with the rights of chartered cities and counties to determine the compensation of their employees. (Sonoma County, at p. 314.) The court stated “[t]here can be no doubt that there is a conflict between the provision of [Government Code] section 16280 invalidating wage increases agreed to by cities and counties and the ordinances or resolutions of the local agencies which ratified the agreements.” (Id. at p. 315.)
The court then addressed whether the condition in Government Code section 16280 “that state funds are to be granted only to those local agencies *1511 which do not pay salary increases may be upheld in spite of [its] conclusion that the provision invalidating agreements for such increases is unconstitutional.” (Sonoma County, supra, 23 Cal.3d at pp. 318-319.) On this point, the court noted “ ‘constitutional power [could not] be used by way of condition to attain an unconstitutional result’ ” to conclude the state could not require as a condition of granting funds that the local agencies impair valid contracts to pay wage increases. (Id. at p. 319.) The court then found the condition in question invalid as applied to city and county employees who were not entitled to a wage increase by contract, noting the Legislature intended to treat all local government employees and officers in a uniform manner and distinguishing application of the condition between employees who had a contractual right to a wage increase and those who did not violated that intention. (Ibid.)
The Cities and the League rely on this latter portion of Sonoma County for the proposition that the Legislature has used its constitutional power (enacting § 1782) to obtain an unconstitutional result (requiring charter cities to give up their constitutional home rule power over their municipal affairs and comply with the prevailing wage law). Sonoma County does not advance the Cities’ argument as the state statute at issue in Sonoma County conflicted with agreements made by cities and counties and the ordinances or resolutions of the local agencies ratifying the agreements and thus led to the unconstitutional result of impairing existing contracts and the home rule authority of charter cities. (Sonoma County, supra, 23 Cal.3d at pp. 314, 315.) Here, there is no conflict between section 1782 and the Cities’ resolutions or ordinances. Because no conflict exists between section 1782 and the Cities’ laws, we need not reach the questions whether section 1782 addresses a matter of statewide concern or whether section 1782 is reasonably related to the resolution of that concern and narrowly tailored to avoid unnecessary interference in local governance. (Vista, supra, 54 Cal.4th at p. 556.)
2. Article XIII, section 24, subdivision (b)
In November 2010, California voters passed Proposition 22, which amended the California Constitution to provide that “[t]he Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government’s purposes.” (Cal. Const., art. XIII, § 24, subd. (b), as added by Prop. 22, § 3, Gen. Elec. (Nov. 2, 2010).) The Cities assert section 1782 violates article XIII, section 24, subdivision (b) of the California Constitution because it unconstitutionally restricts the use of the proceeds of taxes imposed by charter cities by requiring local funds be used for the payment of prevailing wages instead of being used for another aspect of the project of a city’s choosing. The Cities tacitly concede section 1782 does not *1512 expressly require charter cities to pay prevailing wages; rather, they assert the coercive nature of section 1782 restricts the use of local revenues as it operates to force the payment of prevailing wages on locally funded public works projects.
As discussed above, we concluded section 1782 did not conflict with charter city law and rejected the Cities’ argument that section 1782 is coercive. (Ante, pt. II.B.2.) Accordingly, we reject the Cities’ contention that section 1782 violates article XIII, section 24, subdivision (b) of the California Constitution.
3. Response to Dissent
We agree with the statement of our dissenting colleague that “our home rule jurisprudence does not appear to turn on the difference between state incentives and state coercion.” (Dis. opn., post, at p. 1515.) In their opening brief the Cities argued section 1782 amounted to financial coercion. Because the Cities raised the issue, respondents necessarily responded to the argument and we addressed it.
The home rule doctrine provides that with respect to municipal affairs, city charters “supersede all laws inconsistent therewith.” (Cal. Const., art. XI, § 5, subdivision (a).) Once it is determined that the matter at hand constitutes a municipal affair the relevant inquiry is whether there is a conflict between state law and charter city law. (Vista, supra, 54 Cal.4th at p. 556.) If there is no conflict between state law and charter city law, the analysis is complete. (Cal. Fed. Savings, supra, 54 Cal.3d at p. 16.)
Here, the majority in Vista concluded that the wage levels of contract workers constructing locally funded public works are a municipal affair. (Vista, supra, 54 Cal.4th at p. 558.) We are bound by this conclusion. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) However, unlike Vista, there is no genuine conflict between section 1782 and charter city law. Accordingly, the “home rule” provision of the California Constitution does not bar the application of section 1782 to charter cities. We disagree with our dissenting colleague’s conclusion that Sonoma County is analogous. (Dis. opn., post, at p. 1514.) In that case a conflict existed between state law and charter city law. (Sonoma County, supra, 23 Cal.3d at p. 315.) No such conflict exists here.
DISPOSITION
The judgment is affirmed. Respondents are entitled to their costs on appeal.
McConnell, P. J., concurred.